In re Mario and Maria PEREZ, Eddie Lanier, Dionisio Frias & Renee Bryan, Joey Wayne Hatcher, Clayton R. Stewart, Debtors.

Nos. 05–95103–13, 05–95102–13, 06–30021–13, 06–30008–13, 05–95264–13.

United States Bankruptcy Court, S.D. Texas, Houston Division.

March 23, 2006.

Reese W. Baker, Baker and Associates LLP, Houston, TX, for Mario and Maria Perez, Eddie Lanier, Dionisio Frias, Renee Bryan, and Joey Wayne Hatcher.

David W. Barry, Law Office of David W. Barry, Houston, TX, for Clayton R. Stewart.

## MEMORANDUM OPINION

JEFF BOHM, Bankruptcy Judge.

### I. INTRODUCTION

This Memorandum Opinion is written to address a very important issue to Chapter 13 debtors in general and the several Chapter 13 Debtors referenced above: Should they be allowed to pay their home mortgage lenders directly instead of remitting the necessary funds to the trustee for distribution to the mortgagees? Debtors Perez, Lanier, Frias, Bryan, Hatcher, and Stewart (the Debtors) assert that they should be allowed to do so.[1] This Court disagrees. This Opinion sets forth how the Court has arrived at its decision.

### II. HISTORICAL BACKGROUND

 The duties of a Chapter 13 trustee include serving as the disbursing agent.[2] *In re Mendoza*, 111 F.3d 1264, 1267 (5th Cir.1997); *In re Weaver*, 632 F.2d 461, 465 (5th Cir.1980). The general rule is that debtors make monthly payments to the trustee, who then disburses the monies to holders of allowed claims. 11 U.S.C. § 1326(b) (2005); *In re Foster*, 670 F.2d 478, 486 (5th Cir.1982) (observing, "Nonetheless, § 1326(b) also 'makes it clear that the Chapter 13 trustee is normally to make distributions to creditors of the payments made under the plan by the debtor.'" (citations omitted)).[3] The rationale for this system is this: (a) in order for consumer debtors to successfully reorganize, they need to be shielded from all their creditors so that they can focus on generating maximum income to pay the trustee; (b) in order for creditors to timely receive payments on their claims without having to spend undue time and expense, they need to avoid having to deal extensively with troubled borrowers and their attorneys; and (c) the trustee serves as a buffer between debtors and creditors by assuming the responsibility for receiving payments from debtors and remitting funds to claim holders. *See In re Barber*, 191 B.R. 879, 881 (D.Kan.1996) (stating, "The bankruptcy court noted that the preference is for payments to be made through the trustee and explained the reasons for that preference: 'It's certainly administrative efficiency; the ability to track to whom and when and what payments are made; fairness and treatment of various creditors and there is greater opportunity for the debtor to fail, should the debtor make his own payments as opposed to

---

**1.** A separate hearing was held for each of these Debtors. However, because each seeks the same relief—namely, to be allowed to make their monthly mortgage payment directly to the mortgage holder instead of through the trustee—the Court has written this opinion covering all of these Debtors.

**2.** Serving as a disbursing agent is only one of the many functions performed by a Chapter 13 trustee. The other functions are subsequently discussed in this opinion.

**3.** "In enacting the 1986 amendments which, inter alia, placed the Chapter 13 Trustee system under the control of the United States Trustee, Congress abrogated § 1302(e) and with it a Chapter 13 Trustee's ability to surcharge payments disbursed directly from the debtor to a creditor. This change has had the effect of statutorily overruling this portion of the *Foster* opinion." *In re Gregory*, 143 B.R. 424, 427 n. 2 (Bankr.E.D.Tex.1992) (citations omitted). Aside from this one point, *Foster* retains its vitality.

making them through the trustee.' "); *In re Harris,* 107 B.R. 204, 206–07 (Bankr. D.Neb.1989); *In re Barbee,* 82 B.R. 470, 474–75 (Bankr.N.D.Ill.1988).

 As with most general rules, there are exceptions. The Bankruptcy Code does allow for debtors to bypass the trustee and make payments directly to creditors. 11 U.S.C. § 1326(b); *Foster,* 670 F.2d at 486 (stating that "[the Fifth Circuit] agrees with those courts which have concluded that Congress left open in § 1326(b) the possibility of direct disbursements 'under the plan' by the Chapter 13 debtor.").[4] However, whether a debtor may do so rests within the discretion of the bankruptcy court. *Foster,* 670 F.2d at 486. Direct disbursements by debtors is not an unqualified right; rather, it is a privilege. *In re Slaughter,* 188 B.R. 29, 31 (Bankr.D.N.D.1995); *In re King,* 116 B.R. 413, 414 (D.N.J.1990).

For many years within the Southern District of Texas, Chapter 13 debtors were routinely allowed to make their monthly mortgage payments directly to their home lenders.[5] In 2003, this practice ceased in three divisions of the Southern District of Texas: the Corpus Christi, Brownsville and McAllen Divisions. The debtors in these divisions were no longer routinely permitted to serve as their own disbursing agent; their only payments since have been through the Chapter 13 trustee. The Chapter 13 trustee for these divisions has been making all disbursements, including payments to mortgage companies.

This change in practice in the Corpus Christi, Brownsville, and McAllen Divisions produced a more efficient administration of Chapter 13 cases. Mortgage companies filed fewer motions to lift stay. Since each motion to lift stay costs the debtor about $1,000.00,[6] the reduction in

---

4. The term "under the plan" properly refers to any payment made pursuant to the provisions of a Chapter 13 plan, regardless of whether such payment is made through the trustee or by a debtor directly to a creditor. Unfortunately, over the years, certain nomenclature has evolved which has led to confusion over the meaning of the phrase "under the plan." The term "outside the plan" is bankruptcy parlance that has been used to describe a payment made by a debtor directly to a creditor without going through the Chapter 13 trustee. Some practitioners and courts believe that making a payment "outside the plan" means that the payment is not made "under the plan." *In re Gregory,* 143 B.R. at 427 (referring to "outside the plan" as treatment of creditors "not specified in or governed by the plan") (citing *In re Evans,* 66 B.R. 506, 511 (Bankr.E.D.Pa.1986); *In re Ballard,* 4 B.R. 271, 278 (Bankr.E.D.Va. 1980)). Conversely, the term "inside the plan" has been used to describe a payment made by a debtor through the trustee, and some practitioners and courts believe that only such payments as these are made "under the plan." This Court disagrees with both of these views. Every Chapter 13 plan which this Court has reviewed reflects which claims

will be paid through the trustee and which claims will be paid directly by the debtor; therefore, when the plan is confirmed, all payments that are referenced in the plan, regardless of whether they are made by the trustee or directly by the debtor, are payments made "under the plan." For these reasons, the Court believes that the use of the terms "outside the plan" and "inside the plan" are confusing. Robert B. Chapman, *The Bankruptcy of Haig–Simons?,* 10 AM. BANKR. INST. L. REV. 765, 847 n. 446 (2002). It would be preferable to discard the use of these two phrases and, instead, use the phrases "payments through the trustee" and "direct payments by the debtor"—all of which are payments made "under the plan."

5. Additionally, Chapter 13 debtors in this District have frequently been allowed to make direct payments to their vehicle lenders.

6. The filing fee for a motion to lift stay is $150.00, and the creditor's counsel fee is typically $500.00. Both are usually added to the mortgage debt since the lien document usually provides that collection fees constitute part of the lien claim. In addition, debtors' counsel are usually authorized to charge $250.00

such motions has materially reduced costs for the debtors in these three divisions and improved the prospects for successful completion of Chapter 13 cases. Indeed, in the Corpus Christi, McAllen, and Brownsville Divisions, more confirmed Chapter 13 plans have been successfully prosecuted, with debtors making all of their plan payments to the trustee and thereby obtaining a discharge.

These results were one reason that the five bankruptcy judges sitting in the Houston, Victoria, Laredo and Galveston Divisions decided in 2005 to implement the same approach in these four divisions. A second reason concerned the increasing frequency of disputes between debtors and their mortgage lenders as to whether and when payments have been made and received. Unfortunately, as mortgages are packaged and sold with increasing frequency and in greater numbers, the record-keeping of the note holders, and their servicing agents, has deteriorated. The absence of accurate records of payment receipts, combined with the endemic failure of consumer debtors to maintain accurate records of their payments, has caused confusion and delay in the prosecution and resolution of motions to lift stay and, in some cases, has resulted in debtors losing their homes because they could not prove that payments had been made. These circumstances have led the five judges to spend substantial court time on these matters, particularly in the Houston Division.

Bankruptcy courts across the nation have recognized the need for debtors to make residential mortgage payments through the trustee and have mandated it in increasing numbers:

> The data ... show secured debt accounting for 54–59 percent of total disbursements over the years 1994–2003. Obscured in the numbers is a re-allocation of percentages of post-petition payments and mortgage arrearage payments.... During the past four years, the numbers of trustees making post-petition mortgage payments inside the plan ("conduit payments"), and the amounts being paid, have increased substantially.... There are good reasons to believe that this practice works to the benefit of creditors, debtors, and trustees.

Gordon Bermant, *Trends in Chapter 13 Disbursements,* FEB-24 AM. BANKR.INST. J. 20 (2005) [App. E].

A research report sponsored by the endowment of the National Conference of Bankruptcy Judges carried out by Gordon Bermant, a retired research professional of the Federal Judicial Center, emphasizes that Chapter 13 plans are more effective when home mortgage payments are made through the trustee. Gordon Bermant, *Paying the Ongoing Mortgage Through the Chapter 13 Plan: A Beneficial Practice for All Involved* (This report is a draft and will be developed further prior to publication.) [App. F]. In light of the benefits of making mortgage payments through the Chapter 13 trustee, the local rules for the Eastern District of Michigan virtually require debtors to do so:

> The district has used local rules to make the practice virtually compulsory by placing the burden of justifying direct payments on the debtor. Debtor's attorneys have also settled on routine plan language that assures agreement between the trustee's records and the mortgage holder's records at the time the case is terminated. Another local rule requires holders to serve notice in advance of any changes contemplated

to defend each motion to lift stay and an additional $400.00 to subsequently modify the debtor's Chapter 13 plan to set forth when the debtor will make the missed payments.

for the size [of] a debtor's required monthly payment. Requiring notice avoids later litigation in circumstances where the mortgage holder has, for example, obtained force-placed insurance to protect the collateral and passes the cost to the debtor with unannounced increases in the loan amount. All of these provisions benefit the court as well as the debtor, by reducing the amount of litigation over alleged debt remaining at the time the case is terminated.

*Id.* at 29 (citing Marilyn R. Somers and Kimberly Shorter--Siebert, *Is It Really a Fresh Start?*, NACTT QUARTERLY 16 (2004)).

For these reasons, all six bankruptcy judges of the Southern District of Texas unanimously voted to implement a new Local Rule that took effect on October 17, 2005. Local Rule 3015(b) (the Local Rule) sets forth that "[h]ome mortgage payments will be made through the chapter 13 trustee, in accordance with Home Mortgage Payment Procedures (the Procedures). Home Mortgage Payment Procedures shall be procedures adopted by the Chapter 13 trustees and approved by the court." Local Rule 3015(b) is attached to this Memorandum Opinion as Appendix A, and the Home Mortgage Payment Procedures are attached as Appendix B. Debtors Perez, Lanier, Frias, Bryan, Hatcher, and Stewart seek relief from the Local Rule and the Procedures to allow them to make direct payments to their mortgage lenders. To be sure, the Local Rule allows any debtor to seek relief from the Procedures. The purpose of this memorandum opinion is to determine whether these Debtors qualify for relief from the Procedures.

The Debtors argue that if they have to make their mortgage payments through the trustee, the Debtors must pay the trustee not only the amount of the mortgage payment, but also an additional sum to cover the trustee's fee.[7] Because the mortgage payments are overwhelmingly the largest monthly cash outlay for these Debtors, the trustee's fee is not insignificant.[8] It is therefore not surprising that the Debtors argue that based primarily

---

7. Pursuant to 28 U.S.C. § 586(e), a standing Chapter 13 trustee may receive a fee, which is set by the Attorney General, not to exceed 10% of all payments received by the trustee. *See, e.g., In re Leslie*, 318 B.R. 108, 111 (Bankr.N.D.Tex.2004); *In re Reid*, 179 B.R. 504, 508 n. 2 (E.D.Tex.1995); *In re Turner*, 168 B.R. 882, 884 (Bankr.W.D.Tex.1994). In addition, 28 U.S.C. § 586(e)(1)(A)(i) limits the standing Chapter 13 trustee's total annual compensation, which is established administratively each year. Stephen L. Sepinuck, *Rethinking Unfair Discrimination in Chapter 13*, 74 AM. BANKR.L.J. 341, 344 n. 11 (2000). "Because of [the limit on annual compensation], standing Chapter 13 trustees in some districts—particularly large districts with numerous Chapter 13 cases—routinely take less than the ten percent maximum. *See, e.g., In re McNichols*, 249 B.R. 160, 175 (Bankr. N.D.Ill.2000) (6.6%); *In re Martin*, 233 B.R. 436, 438 (Bankr.D.Ariz.1999) (7%); *In re Janssen*, 220 B.R. 639, 644 (Bankr.N.D.Iowa 1998)(9%)." *Id.* Because there was no evidence introduced in the cases at bar as to what percentage the trustees in the Southern District of Texas receive, and also for the sake of simplicity, this opinion uses the maximum percentage fee that a trustee may receive, 10%. *See id.* (citing *In re Mathenia*, 220 B.R. 427, 428 n. 2 (Bankr.W.D.Okla.1998) (computing the trustee's take at ten percent to determine feasibility of plan, even though a lower percentage is often charged)).

8. Although payment of the trustee's fee is required if the mortgage payment is made through the trustee, frequently (but not in all cases) the debtor need not make any additional payments since the payment is merely deducted from the amount that would otherwise be distributed to unsecured creditors. In addition, payment of mortgage payments through the trustee will eventually reduce the trustee's commission, thus reducing or eliminating the burden on debtors.

upon sheer economic grounds, the Local Rule and the Procedures should be waived for them. What is surprising—or at least ironic—is that the Debtors also assert that the Local Rule and Procedures should not be applied because they violate sections of the Bankruptcy Code that were passed to protect home lenders, not debtors.

## III. FINDINGS OF FACT

A. Mario and Maria Perez

1. Mr. and Ms. Perez have owned their home for sixteen (16) years.

2. They generally made their monthly payments on a timely basis for fifteen (15) years.

3. Their monthly mortgage payment is $660.00.

4. They were approximately $8,000.00 in arrears on their mortgage payments when they filed their Chapter 13 petition on November 1, 2005. Accordingly, they were over a full year behind in making mortgage payments.

5. The reasons they fell behind were due to: (a) Mr. Perez being unemployed; and (b) Ms. Perez being diagnosed with breast cancer, the treatment for which required the Debtors to expend considerable sums of money.

6. Their mortgage lender is ABN AMRO Mortgage Group.

7. If they have to make their mortgage payment through the trustee, they will have to pay an additional $66.00 per month, assuming that the trustee's fee is 10% of the mortgage payment.

8. Their plan is a 60 month plan, which means that if they have to make their mortgage payment through the trustee, they will have to pay $3,960.00 ($66.00 × 60 months) more than if they made their payments directly to ABN AMRO Mortgage Group.

9. After filing their Chapter 13 petition, Mr. and Ms. Perez established an ACH account at their bank so that the trustee could debit this account each month to collect the payment proposed under the Perez's Chapter 13 plan.[9] When the trustee proceeded to make the initial debit, the bank informed him that the account had insufficient funds. Therefore, Mr. and Ms. Perez immediately fell into default with the trustee.

B. Eddie Lanier

10. Mr. Lanier has owned his home for three (3) years.

11. He generally made his monthly mortgage payments on a timely basis for two (2) years.

12. Mr. Lanier's monthly mortgage payments total $3,319.62, representing payment of a first lien and a second lien. His actual pre-tax monthly income for the six months preceding the filing of this bankruptcy was less than $5,000.00.[10] His projected expenses in his

---

9. In the Southern District of Texas, some debtors choose to make their payments to the trustee by establishing an account at their bank whereby the trustee automatically debits the account rather than receiving a check from the debtor.

10. This Court takes judicial notice of Mr. Lanier's Form B22C, Statement of Current Monthly Income and Calculation of Commitment Period and Disposable Income; Schedule I, Current Income of Individual Debtor(s); and Schedule J, Current Expenditures of Individual Debtor(s). [Docket Nos. 8, 39]. This Court further takes judicial notice of the Form B22C, Schedule I, and Schedule J of each of the other Debtors discussed in this Opinion.

Schedule J are $7,158.72. Accordingly, it appears that he presently has inadequate income to pay his mortgage directly or through the trustee. Mr. Lanier's Schedule I monthly income projection of $8,784.94 is highly questionable considering his past income as reflected in his Form B22C. Aside from the questionable projected income in his Schedule I, Mr. Lanier's Form B22C calls into question whether he could fund his Chapter 13 plan even if he was not paying the trustee's ten percent fee on his home mortgage payments.

13. Mr. Lanier had not made any payments on his mortgage for approximately one year when he filed his Chapter 13 petition on November 1, 2005. Thus, he was approximately $39,835.44 in arrears on his filing date.

14. The reason he fell behind was due to his unemployment for a period of time. Mr. Lanier's schedule I shows that he has been self employed for 3 years. Mr. Lanier testified that he is a self employed contractor for SBC. However, he further testified that he fell behind on his mortgage payments because he was not able to obtain any contracts to perform jobs and was out of work for almost one year.

15. His mortgage lender is Bank of America.

16. If he must make his monthly mortgage payment through the trustee, he will have to pay an additional $333.00 per month, assuming that the trustee's fee is 10% of the mortgage payment.

17. His plan is a 60 month plan, which means that if he has to make his mortgage payment through the trustee, he will have to pay approximately $20,000.00 ($333.00 × 60 months) more than if he made his payments directly to Bank of America.

18. Mr. Lanier's house has the following characteristics:
(a) It is 5,400 square feet;
(b) It has 5 bedrooms; and
(c) It has 11 rooms in total, including a dining room and a study.

19. Mr. Lanier has failed to file tax returns for 2001 and 2004, and his plan provides for no tax payments.

C. Dionisio Frias and Renee Bryan

20. These Debtors have owned their home for eleven (11) years.

21. They generally made their monthly mortgage payments on a timely basis for several years until their daughter had to enter into a drug rehabilitation, which caused these Debtors to divert monies from their mortgage lender to those entities and persons caring for their daughter.

22. Their monthly mortgage payment is $593.00. This payment does not include funds to escrow payment of taxes and insurance.

23. According to Mr. Frias and Ms. Bryan, they were approximately $5,000.00 in arrears when they filed their Chapter 13 petition on January 2, 2006.[11]

24. Aside from their daughter's need to enter drug rehabilitation, other reasons that they fell into arrears with their mortgage lender were: (a) Mr. Frias was bitten by a brown

11. The proof of claim says $9,748.93. [Claim No. 5].

recluse spider, which required medical attention and therefore expenditure of monies from their own pocket, as insurance from Mr. Frias's employer did not cover all expenses; (b) Their son needed surgery, which also required them to divert some funds; (c) Ms. Bryan needed surgery, thereby causing the diversion of more funds from the mortgage company; and (d) Ms. Bryan suffered a stroke, causing diversion of additional funds for medical expenses.

25. Their mortgage lender is Wells Fargo Bank, N.A., and America's Servicing Company collects the mortgage payments.

26. If they have to make their mortgage payment through the trustee, they will have to pay an additional $59.30 per month, assuming that the trustee's fee is 10% of the mortgage payment.

27. Their plan is a 60 month plan, which means that if they have to make their mortgage payment through the trustee, they will have to pay approximately $3,558.00 ($59.30 × 60 months) more than if they made their payments directly to America's Servicing Company.

28. Mr. Frias has been employed at the Weyerhauser Company for ten (10) years.

29. Ms. Bryan home-schools their four children, whose ages are 15, 13, 12 and 4.

30. Ms. Bryan is presently unemployed, but she will soon begin work cleaning houses.

31. Mr. Frias and Ms. Bryan do not want to directly pay their mortgage payments themselves. Rather, they want Weyerhauser, Mr. Frias' employer, to send the payment directly to America's Servicing Company.

### D. Joey Wayne Hatcher

32. Mr. Hatcher's monthly mortgage payment is $985.00.

33. He had not made any payments for about one (1) year when he filed his Chapter 13 petition on January 2, 2006. Thus, he was approximately $11,820.00 in arrears.

34. The reason he fell behind was due to his unemployment in 2004. He found employment in January of 2005 and is still employed today. In fact, he recently received a salary increase from $38,000.00 to $41,000.00.

35. His mortgage lender is Colonial Savings.

36. The success of his plan depends, in part, on the income that his life partner will provide.

37. If he has to make his mortgage payment through the trustee, he will have to pay an additional $98.50 per month, assuming that the trustee's fee is 10% of the mortgage payment.

38. His plan is a 60 month plan, which means that if he has to make his mortgage payment through the trustee, he will have to pay approximately $5,910.00 ($98.50 × 60 months) more than if he made his payments directly to Colonial Savings.

39. He does not want to directly pay Colonial Savings; rather, he wants his employer, GWA–Datatrac, to send payments directly to Colonial. He has had to pay a fee to Colonial to set up this arrangement.

E. Clayton R. Stewart

40. Mr. Stewart's monthly mortgage has been $936.00, but this amount excludes any escrow for taxes and insurance. Mr. Stewart testified that his mortgage company has recently notified him that his monthly payment in the future will include an escrow for taxes and insurance. He further testified that the monthly payment will therefore increase from $936.00 to approximately $1,200.00.

41. He had not made any payments for about seven months when he filed his Chapter 13 petition on December 3, 2005. Thus, he was approximately $6,552.00 in arrears.

42. Although this case was filed on December 3, 2005, Mr. Stewart failed to pay his monthly mortgage payments in December of 2005, January of 2006 and February of 2006. Thus, Mr. Stewart has not made any mortgage payments for ten months.

43. The reason he fell behind was due to his wife's chronic lower back problems, which have resulted in substantial medical expenses.

44. His mortgage lender is Countrywide.

45. He has been employed with the City of Houston for approximately 24 years as a traffic light inspector. His monthly income is approximately $3,000.00. In 2004, his annual income was approximately $44,331.00, and in 2005, he earned approximately $43,700.00. However, in the six months preceding the filing of the case, Mr. Stewart's annualized income was approximately $41,500.00. (Stewart Form B22C, Doc. No. 13.) He testified that his salary will remain the same for the foreseeable future. His wife receives social security benefits of approximately $400.00 per month.

46. Mr. Stewart and his wife have four children, but three are adults who do not reside with their parents. Mr. Stewart has one minor child at home.

47. Mr. Stewart's house is 2,800 square feet. He and his wife purchased this house in April of 2004. When they purchased this house, Mr. Stewart's wife was not working. Prior to purchasing this house, Mr. Stewart and his wife resided in an apartment; and prior to residing in that apartment, they lived in a different house than the one that they presently occupy.

48. The annual taxes on the house are approximately $3,000.00.

49. Mr. Stewart and his wife have approximately $400.00 in their savings account.

50. Mr. Stewart's bank is willing to remit the monthly mortgage payment to Countrywide provided that there are sufficient funds in the account. According to Mr. Stewart, this bank will not charge for remitting these funds each month.

51. Mr. Stewart's plan is a 57 month plan, which means that if he has to make his mortgage payment through the trustee, he will have to pay approximately $6,840.00 ($120.00 × 57 months) more than if he made his payments directly to Countrywide.

## IV. CONCLUSIONS OF LAW

The Debtors assert that the Local Rule and Procedures violate the Bankruptcy Code. The Debtors alternatively argue

that even if the Local Rule and Procedures do not violate the Bankruptcy Code, their own particular circumstances justify a waiver of the Local Rule and Procedures so that they may make direct payments to their respective mortgage companies. This opinion will first address the statutory arguments, and then analyze the merits of each Debtor's situation.

A. *Contrary to the Debtors' argument, Bankruptcy Local Rule 3015(b) and the Home Mortgage Payment Procedures do not violate 11 U.S.C. § 1326(a)(2).*

█ Bankruptcy Local Rule 3015(b) sets forth that home mortgage payments will be made through the Chapter 13 trustee in accordance with the Home Mortgage Payment Procedures adopted by the Chapter 13 trustees in the Southern District of Texas and approved by this Court. New procedures have been put into effect, and one of them is that trustees may make mortgage payments prior to confirmation.

The Debtors argue that Local Rule 3015(b) violates 11 U.S.C. § 1326(a)(2) because that section requires the trustee to hold payments until the plan is confirmed. If the trustee must hold monies until the plan is confirmed, the trustee is forbidden from making pre-confirmation monthly payments to mortgagees. Thus, according to the Debtors, they themselves should serve as the disbursing agents because, unlike the trustee, the Bankruptcy Code does not prohibit them from paying their lenders prior to confirmation.

This argument is disingenuous at best.[12] Section 1324 of the Bankruptcy Code requires the court to hold the confirmation hearing within 45 days after the first meeting of creditors. Rule 2003 of the Federal Rules of Bankruptcy Procedure requires the creditors' meeting to be held within 40 days after the case was filed. Thus, the confirmation hearing must be held within 85 days after the case was filed, and it could well be held earlier. Given these deadlines, there should not be more than one or two mortgage payments (out of 60 in most plans) that would be affected by this legal argument. The Court clearly has authority, exercisable in its discretion, to require the other 58 payments to be made through the trustee. § 1326(c); *In re Gregory*, 143 B.R. at 426. Therefore, this argument is a red herring. It is unreasonable to suggest that debtors are better served by paying a fee so that the first one or two payments can be made "directly" by the debtor himself or herself while the remaining 58 payments are paid through the trustee.

But even as to these first one or two payments, the Debtors' argument that the trustee is forbidden to make pre-confirmation payments is incorrect. Under the Court's Local Rule and Procedures, these such payments are not *plan* payments, but rather *adequate protection* payments.

Section 1326(a)(2) reads as follows:

(2) *A payment made under paragraph (1)(A)* shall be retained by the trustee until confirmation or denial of confirmation. If a plan is confirmed, the trustee shall distribute any such payment in accordance with the plan as soon as practicable. If a plan is not confirmed, the trustee shall return any such payments not previously paid and not yet due and owing to creditors pursuant to paragraph (3) to the debtor, after

---

12. Of course, even if this argument has merit, it would only justify a minor change in the Procedures that would have pre-confirmation payments made directly or that would have the Chapter 13 trustee hold the pre-confirmation payments pending confirmation. However, as discussed herein, this Court does not believe that the Debtors' argument has merit.

deducting any unpaid claim allowed under section 503(b).

(emphasis added).

The phrase "payment made under paragraph (1)(A)" refers to any payment made to the trustee by the debtor under 11 U.S.C. § 1326(a)(1), which reads as follows:

(a)(1) Unless the court orders otherwise, the debtor shall commence making payments not later than 30 days after the date of the filing of the plan or the order for relief, whichever is earlier, in the amount—

(A) *proposed by the plan to the trustee;*

(B) scheduled in a lease of personal property directly to the lessor for that portion of the obligation that becomes due after the order for relief, reducing the payments under subparagraph (A) by the amount so paid and providing the trustee with evidence of such payment, including the amount and date of payment; and

(C) that provides adequate protection directly to a creditor holding an allowed claim secured by personal property to the extent the claim is attributable to the purchase of such property by the debtor for that portion of the obligation that becomes due after the order for relief, reducing the payments under subparagraph (a) by the amount so paid and providing the trustee with evidence of such payment, including the amount and date of payment.

(emphasis added).

The emphasized language leaves no doubt that the payments made by the debtor under § 1326(a)(1)(A) include only the payments proposed under the plan. This section does *not* cover adequate protection payments to a holder of a lien on real property. *In re Ingle,* 91 B.R. 27, 29 (Bankr.E.D.Mich.1988); *See In re Cook,* 205 B.R. 437, 439–40 (Bankr.N.D.Fla. 1997); *contra In re Cason,* 190 B.R. 917, 931–33 (Bankr.N.D.Ala.1995) (rejecting the *Ingle* court's holding that plan payments encompass adequate protection payments).[13]

■ Adequate protection payments to real estate lien holders are not payments made under a proposed plan. Rather, the debtor in a Chapter 13 case makes adequate protection payments pursuant to 11 U.S.C. § 1303, which states, in pertinent part, that "the debtor shall have, exclusive of the trustee, the rights and powers of a trustee under section . . . 363(e) . . . of this title." Section 363(e) circumscribes the debtor's right to use property,[14] but also

---

**13.** Prior to the passage of the Bankruptcy Abuse Prevention and Consumer Protection Act, § 1326(a)(1) did not cover adequate protection payments of any kind. The passage of the Act resulted in § 1326(a)(1)(C) covering pre-confirmation adequate protection payments to holders of liens on personal property. However, there was no similar amendment for holders of liens on real property. Accordingly, congressional intent appears to be that § 1326(a)(1)(C) will govern pre-confirmation adequate protection payments for holders of liens on personal property, but not adequate protection payments for holders of liens on real property. Courts must look to some provision other than § 1326(a)(1) for analyzing adequate protection payments to real property lien holders in Chapter 13 cases.

**14.** Arguably, section 363(e) can be interpreted to mean that the debtor has the right to use the property so long as the debtor provides adequate protection. *See In re Rutherford,* 329 B.R. 886, 892 (Bankr.N.D.Ga.2005) (holding that sections 363(b) and (e) provide that "the trustee or debtor-in-possession may use property of the estate in the ordinary course of business without court approval.").

states that upon request of a lien holder, the court "shall prohibit or condition such use ... as is necessary to provide adequate protection of such interest." Section 361 states that adequate protection may be provided in various ways. Thus, when sections 1303, 363(e), and 361 are read together, a Chapter 13 debtor (just like a Chapter 11 debtor-in-possession) makes adequate protection payments pursuant to a court order under these three sections, not pursuant to a proposed plan. Because § 1326(a)(1) refers to payments "proposed by the plan," *and not to court-ordered adequate protection payments for real estate lien holders*, it follows that § 1326(a)(2) is inapplicable to pre-confirmation adequate protection payments to real estate lien holders; and because of its inapplicability, this section may not be used to bar the trustee from making pre-

confirmation adequate protection payments to mortgagees.

■ The Debtors next argue that even if the trustee may legally make pre-confirmation payments, normal monthly mortgage payments cannot constitute adequate protection because adequate protection refers to payments in the amount of monthly depreciation, not the amount of the contractual payment. This Court disagrees. There is little doubt that adequate protection payments are frequently made in the amount of the monthly depreciation of the collateral. *See, e.g., Cook*, 205 B.R. at 440. Indeed, 11 U.S.C. § 361(1) expressly states that adequate protection may be provided by requiring the trustee "to make a cash payment ... to the extent that the ... use ... under section 363 of this title ... results in a decrease in the value of

However, a narrower interpretation of this provision is that it does not give the debtor the right to use the property, but only authorizes the Court to condition the use of the property by ordering that the debtor provide adequate protection. Even if this narrower interpretation is accepted, a chapter 13 debtor also has the rights and powers of a trustee under section 363(b). This provision states that a debtor, after notice and a hearing, may use, ... other than in the ordinary course of business, property of the estate. "This language, ... which seems better suited for a Chapter 11 reorganization case and its usual commercial setting, appears to be applicable to a transaction or use out of the ordinary course of the Chapter 13 debtor's daily affairs. For example, it would apply to the sale of a residence or motor vehicle, but practicality dictates that it would not be applied to a debtor's worn-out or 'junker' automobile when sold for only a few dollars." *In re Carey*, 202 B.R. 796, 798 (Bankr.M.D.Ga. 1996) (citing 5 WILLIAM L. NORTON, NORTON BANKRUPTCY LAW & PRACTICE § 119–3, at 119–7 (2d ed.1994)). "The perplexities concerning the utilization of property of the estate by a Chapter 13 debtor are compounded by the lack of any express provision authorizing or governing the daily or frequent use of estate property such as a residence, personal motor

vehicle, household furniture, or appliances. Such common usages in the everyday lives of the thousands of Chapter 13 debtors compel the conclusion that this 'usual,' 'common,' or 'ordinary' use or employment of property of the estate in a Chapter 13 case is an assumed right or power, which did not require articulation in the Code." *Id.* (citing *In re Thacker*, 6 B.R. 861 (Bankr.W.D.Va.1980); *In re English*, 20 B.R. 877 (Bankr.E.D.Pa.1982); *First Inv. Co. v. Custer*, 18 B.R. 842 (Bankr.S.D.Ohio 1982)). A debtor's daily use of his home is within the ordinary course of his affairs, so a debtor may use his home without notice and a hearing under section 363(b). "Section 363(b) should be interpreted liberally to provide a bankruptcy judge with 'substantial freedom to tailor his orders to meet differing circumstances' and to avoid 'shack[ling] [the judge] with unnecessary rigid rules ...'" *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 154–55 (D.Del.1999) (quoting *In re Lionel Corp.*, 722 F.2d 1063, 1069 (2d Cir.1983)). Therefore, Chapter 13 debtors have the right to use their houses under section 363(b) so long as adequate protection payments are provided under section 363(e). This Court disagrees with those courts that hold that section 363(b) applies only to business Chapter 13 debtors.

such entity's interest in such property." However, § 361 states that adequate protection may be provided in three ways. Aside from using monthly depreciation as a basis, a second approach is to provide an additional lien or replacement lien equal to the decrease in the value of the creditor's interest in the collateral, 11 U.S.C. § 361(2); and, a third approach is to provide "such other relief ... as will result in the realization by such entity of the indubitable equivalent of the creditor's interest in the collateral." 11 U.S.C. § 361(3). In the cases at bar, § 361(2) is clearly inapplicable because the trustee is not providing an additional or replacement lien, but rather making the monthly mortgage payment.

Does § 361(3) apply? This Court believes it does. It is noteworthy that unlike § 361(1) and § 361(2), § 361(3) makes no reference to the "decrease in the value of such entity's interest" in the collateral. A determination of what constitutes "adequate protection" under § 361(3) is therefore not tied to depreciation of the collateral. The term "indubitable equivalent" is *not* defined in the Bankruptcy Code, or for that matter, anywhere else. The phrase first appeared in Judge Learned Hand's opinion *In re Murel Holding Corp.,* 75 F.2d 941 (2d Cir.1935), and Congress thereafter included this phrase in § 361(3). At least one court has interpreted this phrase to mean that when a mortgagee in a Chapter 13 receives the current monthly payment, as well as payment of arrearages under the plan, this arrangement constitutes the "indubitable equivalent" of the mortgagee's interest under § 361(3). *Commonwealth of Pennsylvania State Employees' Retirement Fund v. Roane,* 14 B.R. 542, 545 (E.D.Pa.1981). The Ninth Circuit Bankruptcy Appellate Panel has held that in a Chapter 11 plan, a secured

creditor who receives all of its collateral in satisfaction of its claim receives the "indubitable equivalent" of its claim. *In re Arnold & Baker Farms,* 177 B.R. 648, 660 (9th BAP Cir.1994). Conversely, this same court has held that "where the creditor is earmarked to receive *part* of its collateral, it will be a rare case in which the creditor will have received the indubitable equivalent of its claim." *Id.* While *Baker Farms* is not as directly on point as *Roane,* its holding nevertheless supports the position that a monthly payment to the mortgagee equal to the full contractual amount constitutes adequate protection under § 363(3) and that any lesser amount is inadequate protection.

The legislative history concerning the meaning of "indubitable equivalent" supports this conclusion. This history states that indubitable equivalent "gives the parties and the courts flexibility by allowing such other relief as will result in the realization by the protected entity of the value of its interest in the property involved. Under this provision, the courts will be able to adapt to new methods of financing and *to formulate protection that is appropriate to the circumstances of the case if none of the other methods would accomplish the desired result.*" H.R.Rep. No. 95–595, at 340 (1977), U.S.Code Code Cong. & Admin.News 1978, pp. 5963, 6296 (emphasis added).

Here, none of the other adequate protection methods are sufficient. Chapter 13 debtors typically do not have unencumbered assets on which to give their home lenders additional liens or replacement liens for the use of the homestead collateral; therefore, the § 361(2) form of adequate protection is not practical.[15] With respect to the § 361(1) form of adequate protection—making a monthly payment

---

**15.** There was no evidence whatsoever that any of the Debtors in the case at bar could give additional or replacement liens to their respective mortgage companies.

equal to the amount of depreciation—there are two problems. First, as a practical matter, it is not cost efficient for Chapter 13 debtors, their lenders, and Chapter 13 trustees to determine the monthly depreciation of the debtors' principal residence. Second, and perhaps more importantly, making a monthly adequate protection payment in the amount of the depreciation would violate the spirit if not the letter of 11 U.S.C. § 1322(b)(2). This provision expressly states that a Chapter 13 plan may not modify the rights of the holder of a lien on the debtor's principal residence. Although particular circumstances may justify a different result, it is incongruous to bless adequate protection payments to Chapter 13 residential lien holders in any amount less than the contractual amount required by the promissory note as the

routine method to be adopted for adequate protection. To do so goes against the express intent of Congress.[16] The only way to satisfy congressional intent is to use the flexible concept of "indubitable equivalent" and hold that making the contractual monthly payment constitutes an indubitable equivalent under 11 U.S.C. § 363(3).[17]

A further reason why § 1326(a)(2) does not bar pre-confirmation payments concerns the period of time when adequate protection is provided. The applicability of adequate protection—*i.e.*, of § 361—with respect to real property in Chapter 13 cases is limited to the time between the filing of the petition and the confirmation of the plan.[18] *In re Brock*, 6 B.R. 105, 107 (Bankr.N.D.Ill.1980); *accord, In re Kennedy*, 177 B.R. 967, 972 (Bankr.S.D.Ala.1995).

**16.** In *Grubbs v. Houston First Amer. Savs. Ass'n*, 730 F.2d 236 (5th Cir.1984), the Fifth Circuit held that the de-acceleration of a mortgage, along with the payment of the pre-petition arrearage through the plan, does not constitute an impermissible modification of the mortgagee's rights under § 1322(b)(2). In arriving at this decision, the Fifth Circuit analyzed, among other points, the legislative history with respect to passage of this provision. *Id.* at 237. The Fifth Circuit further noted that the mortgagees' advocates who testified at a Senate committee hearing focused on convincing Congress that the amount of the monthly mortgage payment should not be reduced in Chapter 13 cases. *Id.* at 245. Accordingly, the history of this statute leaves little doubt that Congress' intent in enacting this provision was to prevent reduction in the amount of the payment.

**17.** It is also worth noting that this is an instance where 11 U.S.C. § 105(a) might well be properly invoked. This section provides that this Court may use its equitable powers to issue any order "that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Although these powers are narrow in scope, *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988), where an express statute such as § 1322(b)(2) seems to require a specific result—here, that the mortgagee receive

its normal monthly payments—the use of § 105 to ensure that these payments are made during the time period between the date of the petition and the date of the plan confirmation seems quite appropriate. *See In re Sadkin*, 36 F.3d 473, 478 (5th Cir.1994) (citing *In re Oxford Mgmt., Inc.*, 4 F.3d 1329, 1333–34 (5th Cir.1993)). As the Fifth Circuit has explained, "[s]ection 105(a) authorizes a bankruptcy court to fashion such orders as are necessary to further the substantive provisions of the Bankruptcy Code. But, the powers granted by that statute must be exercised in a manner consistent with the Bankruptcy Code." *Oxford Mgmt.*, 4 F.3d at 1333–34 (5th Cir.1993) (citing *United States v. Sutton*, 786 F.2d 1305, 1308 (5th Cir.1986); *In re Tex. Consumer Fin. Corp.*, 480 F.2d 1261, 1265 (5th Cir.1973)).

**18.** Although Congress added a new provision effective October 17, 2005 addressing post-confirmation adequate protection for claims secured by personal property during the period of the plan, this provision does not apply to real property. See § 1325(a)(5)(B)(iii)(II); Tex. H. Rept. No. 109–31, U.S.Code Cong. & Admin.News 2005, p. 88 to accompany S. 256, 109th Cong., 1st Sess. (2005), § 309(c)(1), p. 73.

Hence, to say that § 1326(a)(2) prohibits a Chapter 13 trustee from making adequate protection payments to residential lien holders while the plan is pending is to disregard § 361 and impliedly argue that § 361 is inapplicable to Chapter 13 cases. Such a position is incorrect because Chapter 3 of the Bankruptcy Code applies in Chapters 7, 11 and 13 cases. 11 U.S.C. § 103(a); *see In re Walters*, 188 B.R. 582, 585 (Bankr.E.D.Ark.1995). Indeed, as noted above, § 1303 grants debtors the powers under § 363(e), and § 363(e) expressly states that the court shall provide adequate protection. Section 1326(a)(2) simply does not supersede § 361. These two sections are not mutually exclusive.

B. *Contrary to the Debtors' argument, Local Rule 3015(b) and the Home Mortgage Payment Procedures do not violate 11 U.S.C. § 1322(b)(2) or In re Nobelman, 508 U.S. 324, 113 S.Ct. 2106, 124 L.Ed.2d 228 (1993).*

The Debtors argue that Local Rule 3015(b) violates § 1322(b)(2) and *Nobelman* because both this statute and the case prevent modification of any of the rights of holders of liens on a principal residence; and yet, the Local Rule and Procedures require these holders to accept late payments from the trustee and waive their rights to late fees.

■ The Debtors do not have standing to raise this argument. Section 1322(b)(2) protects secured lenders, not debtors, and can be waived only by secured lenders.[19] But even if the Debtors did have standing, their argument fails.

■ Bankruptcy Local Rule 3015(b) reads as follows:

**Mortgage Payments Through the Chapter 13 Trustee.** Home mortgage payments will be made through the chapter 13 trustee, in accordance with the Home Mortgage Payment Procedures. Home Mortgage Payment Procedures shall be procedures adopted by the chapter 13 trustees and adopted by the court.

This Local Rule [App. A] clearly states that a debtor's payments on his or her home mortgage will be made through the Chapter 13 trustee.

The Chapter 13 trustees in the Southern District of Texas adopted certain Home Mortgage Payment Procedures [App. B], and the Bankruptcy Judges in the District unanimously approved these procedures on September 29, 2005. Paragraph 11 of the Home Mortgage Payment Procedures provides as follows:

Amounts received by the holder of the ongoing mortgage prior to confirmation must be applied by the holder to the next payment due without penalty of the terms of the note; or the holder must notify the trustee in writing that it waives all late charges that accrue after the order for relief in this case. Amounts received by the holder of the ongoing mortgage after confirmation must be applied in accordance with the plan.

This particular procedure is more specifically discussed in the Uniform Plan that is

---

19. *See In re F.A. Dellastatious, Inc.*, 121 B.R. 487, 490–91(Bankr.E.D.Va.1990); *see also In re Stangel*, 219 F.3d 498, 500–01 (5th Cir. 2000) (holding that the debtor lacked standing to bring a section 544 avoidance action); *In re Ham Consulting Co.*, 143 B.R. 71, 75 (Bankr.W.D.La.1992) (finding that "the debt-

or lacks standing to assume or reject an executory contract once the case is converted."); *In re Coleman*, 131 B.R. 59, 60 (Bankr. N.D.Tex.1991) (ruling that the debtor lacked standing to object to claims against the bankruptcy estate).

required to be used in the Southern District of Texas.[20]

The Uniform Plan [App. C], in pertinent part, reads as follows:

The Secured Claims held by secured creditors holding a claim secured only by a security interest in real property that is the debtor(s)' residence (other than the arrearage claims set forth in the above table) and other claims treated under § 1322(b)(5) will be paid in accordance with the pre-petition contract held by the holder of the secured claim. The first such payment is due on the first payment due date under the promissory note (after the date this bankruptcy case was filed). During the term of the plan, these payments will be made through the chapter 13 trustee in accordance with procedures adopted from time to time by the chapter 13 trustee and approved by the Court. Each holder of a claim that is paid pursuant to this paragraph must elect to either (i) apply the payments received by it to the next payment due without penalty under the terms of the holder's pre-petition note; or (ii) waive all late charges that accrue after the order for relief in this case. Any holder that fails to file an affirmative election within 30 days of entry of the order confirming this plan has waived all late charges that accrue after the order for relief in this case. Notwithstanding the foregoing, the holder may impose any late charge that accrues following an event of default of a payment due under paragraph 1 of this Plan.

An example is useful to understand the application of this provision. This example assumes that: (1) the monthly mortgage payment is due on the first day of every month; (2) the debtor has until the 15th day of the month to make the payment without being assessed any late charges; and (3) late charges will begin accruing on the 16th day if payment has not been received by the 15th day. If a debtor files a petition on July 10 and makes the first payment to the trustee on August 5, and the trustee remits the monthly mortgage payment on August 15 such that the mortgagee receives the payment on August 20, then the mortgagee must elect to do one of the following:

(1) Apply the payment received on August 20 to the payment that is due on September 1. If the mortgagee opts to take this approach, then the lender will be able to assess late charges associated with the missed payment due on August 1 (and the amounts will be paid pursuant to the plan). However, the mortgagee will not be able to assess late charges on the payment due on September 1 because it has already been paid in advance. Moreover, the next payment made by the trustee will be on or about September 15 and will be received by the mortgagee on or about September 20, and this payment will be applied to the payment due on October 1, thereby once again eliminating any chance of late charges being assessed for a late payment; or

(2) Apply the payment received on August 20 to the payment due on August 1 or some earlier past due payment. If the mortgagee chooses this approach, then the lender automatically waives all post-petition late charges.

The example above illustrates the reason that the Debtors' challenge to the Lo-

---

**20.** Bankruptcy Local Rule 3015(a)(2) states that the Bankruptcy Court will promulgate a uniform form of a Chapter 13 plan from which there will be no variation, absent exceptional circumstances. The Bankruptcy Judges of the Southern District of Texas did, in fact, unanimously promulgate such a form, which became effective on October 17, 2005.

cal Rule and Procedures is incorrect. The Procedures allow the mortgagee to assess late charges for the first month. Requiring the mortgagee to apply the late payment to the next payment due is not an improper modification when the mortgagee will recover the late charges for the first month. At the end of the plan, the mortgagee will have timely received all of the payments due under the note, with the exception of the first payment that came due after the debtor's petition was filed; and, under the plan, the debtor will have to make this payment, plus the late charges, or else no discharge will be granted.[21] Thus, the mortgagee will have received everything that it bargained for under the note.

If the mortgagee is unwilling to apply the first payment received to the next payment due without penalty, then paragraph 11 of the Procedures and the provision in the Uniform Plan state that the mortgagee has waived all of the late charges. The Court is not persuaded that this is a modification of the mortgagee's rights. So long as the mortgagee selects the first option, the mortgagee will receive everything to which it is entitled under the loan documents. There exists no good reason for the mortgagee to reject the first option.

The second option (which covers a waiver of late fees) set forth in paragraph 11 of the Procedures was adopted to bar mortgagees from using existing, or devising new, internal procedures to assess late charges over the life of the plan and then, at the end of the plan, presenting the debtor with a bill for these charges under the pretext that these assessments have some valid basis under the loan documents. The waiver provision is not a modification, but rather a preventative measure taken to ensure that debtors are not surprised at the end of their plans when they learn that, despite making all of the plan payments to the trustee, they still owe their mortgage lender late charges and other assessments and that they face foreclosure if these sums are not paid. It is such a scenario that undermines any confidence that debtors may have in the bankruptcy process.

Even if the Local Rule and Procedures modify the rights of mortgagees, such modification is permissible under 11 U.S.C. § 1322(b)(5). This section sets forth an exception to the general rule of § 1322(b)(2) that a plan may not modify the rights of a home mortgagee. Section 1322(b)(5) allows modification to the extent that the plan provides "for the curing of any default within a reasonable time and maintenance of payments while the case is pending...." *See also Rake v. Wade*, 508 U.S. 464, 473 n. 9, 113 S.Ct. 2187, 2193 n. 9, 124 L.Ed.2d 424 (1993) (explaining that "[w]hen a plan cures a default and reinstates payments on a claim, the creditor's contractual rights arising from the default ... are abrogated and therefore 'modified.' These modifications are allowed under § 1322(b)(5) 'notwithstanding' the fact that § 1322(b)(2) generally prohibits the modification of the rights of mortgage holders.").[22]

**21.** If the lender elects the option, then under a 60 month plan, the payment made in the 60th month would apply to the 1st month's payment. The mortgage payment due in the 60th month would have already been applied by the mortgage holder to the 60th month payment due under the mortgage. In sum, over the life of the plan, 60 payments would be received and 60 payments would be applied.

**22.** In 1994, Congress enacted § 1322(e), which legislatively overruled the specific holding in *Rake* that an oversecured mortgagee is entitled to payment of postconfirmation interest on arrearages (which itself might in-

The Local Rule and Procedures constitute modification, if at all, only to the extent that they allow the debtor to cure the default occurring due to the mortgagee's receipt of the first monthly payment from the trustee after the due date and grace period have passed. The mortgagee will receive the late payment, plus accrued late charges, but only pursuant to the plan, not immediately. It is just such modification that § 1322(b)(5) allows, as expressly stated by the Supreme Court in *Rake. See* 508 U.S. at 473 n. 9, 113 S.Ct. 2187.

This permissible administrative procedure should be contrasted with an impermissible modification of the type discussed in *Grubbs.* There, the Fifth Circuit reviewed the legislative history of § 1322(b)(2) in considering whether de-acceleration of a home mortgage, together with payment of the prepetition arrearage through the plan, was an impermissible modification of the mortgagee's rights under § 1322(b)(2). *Grubbs,* 730 F.2d at 237. The Fifth Circuit determined that it was not impermissible by observing what was impermissible:

> So far as we could find, during a Senate committee hearing held during the 94th Congress the secured creditors' advocates advanced no objection to the curing of default accelerations. *Rather, their attack concentrated upon provisions that permitted modification of a secured claim by reducing the amount of the periodic installments due thereupon (as contrasted with the non-objectionable curing of a default and maintaining those payments), and upon the provisions that permitted reduction of the secured amount of the claim to the value of the collateral.* Hearings Before

the Subcommittee on Improvements of the Judicial Machinery of the Senate Committee on Judiciary, 94th Cong., 1st Sess. (1975) (Statements of Walter Vaughan on behalf of the American Bankers Association, pp. 124–84, esp. pp. 127–28, 130, 132–34, 137–38; and of Alvin Wiese, of the National Consumer Finance Association, pp. 139–84, esp. 141–42, 167–68, 176–80). This Senate hearing in the 94th Congress was the only one conducted by that body preceding the introduction of the final version of S.B. 2266 in the 95th Congress.

*Id.* at 245 (emphasis added).

The Local Rule and the Procedures in no way reduce the amount of the monthly installments due under the note held by the mortgagee nor do they reduce the secured amount of the mortgagee's claim. Accordingly, to the extent the Local Rule and the Procedures affect the manner in which mortgagees exercise their rights, they do not impermissibly do so.

To the extent that the Debtors' argument is that the Local Rule and the Procedures impermissibly modify the rights of the mortgagee because they bless—or at least tolerate—the trustee making payments to mortgagees on a date in the month later than the scheduled date in the note, this attack must also fail. The Local Rule and Procedures address this problem by: (a) allowing the mortgagee to assess late charges if the trustee's first payment is received after the date in the note; and, (b) then requiring the mortgagee to apply all future payments to the next payment due without penalty under the terms of the note.

Further, even if this Local Rule and adopted Procedures were not in effect, this

---

clude preconfirmation interest) regardless of whether the underlying note, deed of trust, or state law permitted the accrual of such interest on interest. *In re Plant,* 288 B.R. 635,

641(Bankr.D.Mass.2003) (citations omitted). However, *Rake's* broader holding that modification is permissible remains valid.

Court would still reject the argument that mortgage payments made by the trustee on a date different than the date in the note constitutes an impermissible modification violative of § 1322(b)(2). This is the very argument that the mortgagee presented in *In re Lee*, 167 B.R. 417, 419 (Bankr.S.D.Miss.1992), *aff'd* 168 B.R. 319 (S.D.Miss.1993), *aff'd* 22 F.3d 1094 (5th Cir.1994). The bankruptcy court rejected the argument with some very astute and practical observations:

> Furthermore, [the mortgagee] seems to assert in each of these cases that the failure of the Chapter 13 Trustee's office to disburse plan funds to [the mortgagee] in accordance with the terms of the original installment contract, i.e. observance of due dates, violates [the mortgagee's] alleged rights under § 1322(b)(2).

> Although [the mortgagee] has chosen an improper procedural vehicle to assert its arguments, the Court would make clear that it finds no merit in the arguments, regardless of the means employed to assert them. The Fifth Circuit Court of Appeals recently dealt with the issue of modification of rights under 1322(b)(2) in *Matter of Nobleman*, 968 F.2d 483 (5th Cir.1992) ... holding that bifurcation of an undersecured claim that is secured by real property that is a debtor's primary residence into both a secured claim and an unsecured claim is prohibited by § 1322(b)(2). Though the court only addressed the issue of bifurcation, in reaching its decision, the court relied on its previous decision, *Grubbs v. Houston First American Savings Association*, 730 F.2d 236 (5th Cir.1984) wherein the court held that "de-acceleration" of a home mortgage, along with payment of the prepetition arrearage through the plan does not constitute an impermissible modification of the secured creditor's rights under § 1322(b)(2).

Although neither of these decisions addressed whether a creditor holding a home mortgage is entitled to disbursements from the Chapter 13 Trustee in accordance with the due date contained in the terms of the original contract, both cases involved home mortgages being paid through the chapter 13 plan, and no suggestion was made by the court that such a method of payment is improper under § 1322(b)(2). *As previously stated, the Trustee's office disburses between 10,000 and 15,000 checks to creditors each month. It would be extremely burdensome for the Chapter 13 Trustee to review every contract involving a home mortgage, determine the due date, and pay each individual creditor in accordance with its particular contract.* If [the mortgagee's] argument were accepted by this Court, then the only way a debtor could comply with the Bankruptcy Code would be to pay any secured creditor protected from modification of its rights under § 1322(b)(2) outside of the plan. Such a result is not mandated by § 1322(b)(2).

*Lee*, 167 B.R. at 428–29 (emphasis added).

Statutory language also supports this conclusion—at least regarding the payments made by the trustee following confirmation of the plan. 11 U.S.C. § 1326(a)(2) states, in pertinent part, that "[i]f a plan is confirmed, the trustee shall distribute any such payment in accordance with the plan *as soon as practicable*." (emphasis added). The phrase "as soon as practicable" supports the *Lee* court's observation that a trustee should not have to review every home lender's note to determine the due date and then remit the payments so that the each mortgagee receives its payment pursuant to the note that it holds. *Lee*, 167 B.R. at 428. Imposing such a requirement would be entirely impracticable. While trustees have

staff and computers to assist them in fulfilling their duties, these personnel and technology are not unlimited—and are not free. One mass distribution of the payments from the trustee each month, on the other hand, falls within the zone of what is practicable under § 1326(a)(2), and therefore what is permissible under § 1322(a)(5).

C. *Contrary to the Debtors' argument, Local Rule 3015(b) and the Home Mortgage Payment Procedures do not violate any priority payment provisions of the Bankruptcy Code.*

█ The Debtors next contend that the Local Rule and Procedures violate the Bankruptcy Code's priority scheme because the procedures allow home mortgage payments to be made ahead of administrative claims. The principal administrative claims in Chapter 13 cases are attorney's fees for debtor's counsel, so the allegation is essentially that the Local Rule and Procedures violate the Bankruptcy Code because they allow payment of mortgage debt ahead of attorney's fees. The Debtors cite no statute or case law to support the view that administrative claims trump secured claims. In fact, the Supreme Court has held that "[a]dministrative expenses . . . do not have priority over secured claims." *Hartford Underwriters Ins. Co. v. Union Planters Bank*, N.A., 530 U.S. 1, 3, 120 S.Ct. 1942, 1946, 147 L.Ed.2d 1 (2000) (citations omitted). Indeed, the Supreme Court has stated in dictum that the general rule is that secured claims are superior to administrative claims with the sole exception being § 506(c) surcharge claims. *Id.* ("Petitioner therefore looked to § 506(c), which constitutes an important exception to *the rule that secured claims are superior to administrative claims.*") (emphasis added).

Under prior procedures in the Houston Division of the Southern District of Texas, Chapter 13 plan confirmation often took many months. When the plan was eventually confirmed, the trustee usually paid the debtor's attorney's fees in full before he paid the other creditors.[23] The new procedures require adequate protection payments to be made pre-confirmation and also require payment of post-petition secured claims concurrently with priority and administrative claims. Contrary to the Debtors' argument, these provisions carry out the priority provisions of, and are specifically permitted by, the Bankruptcy Code.

█ A home lender is a secured creditor. 11 U.S.C. § 506. There is no statutory requirement that attorney's fees be paid ahead of all other creditors. As noted, under the Court's Procedures, payments prior to plan confirmation are adequate protection payments and therefore comply with the Bankruptcy Code for reasons set forth above in the discussion concerning § 361. The post-confirmation payments by the trustee are made in accordance with § 1326(a)(2). Section 1326(b) provides that the payments of administrative claims, such as attorney's fees, are to be made "[b]efore *or at the same time . . . .*" (emphasis added) as other payments to creditors. This section does not mean that administrative claims must be fully paid before any payment is made to another creditor; instead, it is permissible for the trustee to receive a debtor's payment and disburse a portion thereof to the mortgagee.

---

**23.** Indeed, in many instances, upon the filing of the bankruptcy petition, debtors quit paying mortgage notes, in part if not in whole, in order to be able to pay the trustee, who would then distribute the funds first to pay fees of the debtors' counsel.

There is no law that prohibits payment to secured creditors while other claimants wait for payment. As one court explained:

> In a sense, secured claims may be said to have 'priority' over all unsecured claims ... [Because a] secured claim represents the holder's rights in specific property ... [t]he holder of an allowed secured claim has not just a general claim but property which it is entitled to receive. In that sense, secured claims are first priority claims in bankruptcy cases.

*In re Parker,* 15 B.R. 980, 983 (Bankr. E.D.Tenn.1981) (citations omitted); *See In re Aldridge,* 335 B.R. 889, 892 (Bankr. S.D.Ala.2005) (holding that section 1326 permits concurrent payment of secured and administrative claims). Accordingly, the *Parker* court "reject[ed] the argument that administrative expenses must be paid in full before any payments can be made to other creditors." *In re Parker,* 15 B.R. at 983. Therefore, disbursement of home mortgage payments before administrative claims are fully paid is permitted by the Code.

 The Debtors' reliance on § 507(a) of the Bankruptcy Code regarding priorities is misplaced. Section 507(a) sets forth priority payment provisions for administrative claims and unsecured claims. However, nowhere in § 507(a) are secured claims addressed. Therefore, the Debtors' priority scheme argument based on § 507(a) does not apply to the secured claim at issue here—a mortgagee's right to home mortgage payments.

Moreover, § 507(a)(2) is the highest in priority of all administrative claims except child support claims, which is inapplicable here. Section 507(a)(2) encompasses all administrative expenses. Included in these administrative expenses are § 507(b) claims. These particular claims are commonly termed "super-priority claims." Su-per-priority claims must be completely paid off before any other administrative claims are paid. *See In re Colter, Inc.,* 53 B.R. 958, 961 (Bankr.D.Colo.1985); *In re Adams,* 275 B.R. 274, 282 (Bankr.N.D.Ill. 2002). The super-priority claim arises by virtue of holding a lien on property which, when liquidated, turns out to be insufficient to pay the claim. Accordingly, this provision reflects Congress's intent to afford secured claims preeminent status.

A further reason evidencing the preeminent status of home mortgage liens is the existence of section 1322(b)(2). This section establishes that home lenders are creditors deserving of special treatment under the Code. A Chapter 13 plan may not reduce mortgage payments or modify other rights of the mortgagee. 11 U.S.C. § 1322(b)(2); *Rake,* 508 U.S. at 468–69 & n. 5, 113 S.Ct. 2187; *Nobelman,* 508 U.S. at 327, 113 S.Ct. 2106. Therefore, it is incongruous to argue that the trustee should make no payments to a lien holder on a principal residence until administrative claims are paid in full or until the date when the trustee first begins paying a portion of an allowed administrative claim. Here, mortgage payments reign supreme.

Based on the forgoing, the Debtors' argument that the Chapter 13 trustee's disbursement of home mortgage payments under the Local Rule and Procedures violates the Bankruptcy Code's priority scheme fails.

D. *The Local Rules allow Chapter 13 debtors to make payments directly to their mortgage lenders if they merit a waiver of the general rule.*

Disposal of the Debtors' statutory arguments about the enforceability of the Local Rule and the Procedures does not necessarily mean that this Court must deny the relief requested by the Debtors. Paragraph 12 of the Procedures states that

"[t]hese procedures may be varied in a particular case only by order of the Court." The Debtors are therefore invoking this paragraph to request this Court to allow them to make their mortgage payments directly to their mortgagees. There is no question that this Court has discretion to grant or deny this request, but case law has articulated certain factors which this Court should consider in exercising its discretion.

■ In determining whether to confirm a plan providing for direct payments by the debtor, courts have articulated a number of factors to review,[24] including: (1) the degree of responsibility of the debtor, as evidenced by his past dealing with his creditors, *Foster*, 670 F.2d at 487; (2) the reasons contributing to the debtor's need for filing a Chapter 13 petition and plan, *Id.*; (3) any delays that the trustee might make in remitting the monthly payment to the targeted creditor; *Id.*; (4) whether the proposed plan modifies the debt,[25] *In re Reid*, 179 B.R. 504, 508 (E.D.Tex.1995) (citing *In re Gregory*, 143 B.R. 424 (Bankr.E.D.Tex.1992)); (5) the sophistication of the targeted creditor, *Id.*; (6) the ability and incentive of the creditor to monitor payments, *Id.*; (7) whether the debt is a commercial or consumer debt, *Id.*; (8) the ability of the debtor to reorganize absent direct payments, *Id.*; (9) whether the payment can be delayed, *Id.*; (10) the number of payments proposed to pay the targeted claim, *Id.*; (11) whether a direct payment by the debtor under the proposed plan will impair the trustee's ability to perform his standing trustee duties, *Id.*; (12) unique or special circumstances of a particular case, *Id.*; (13) the business acumen of the debtor, *In re Genereux*, 137 B.R. 411, 412–13 (Bankr. W.D.Wash.1992) (citing *In re Pianowski*, 92 B.R. 225, 233–34 (Bankr.W.D.Mich. 1988) (enumerating thirteen factors to be considered in determining whether to allow a Chapter 12 debtor to make direct payments)); *In re Bettger*, 105 B.R. 607, 609 (Bankr.D.Or.1989) (reducing the *Pianowski* factors to eight and applying those factors to determine whether to permit a Chapter 13 debtor to make direct payments); (14) the debtor's post-filing compliance with statutory and court-imposed duties, *Id.*; (15) the good faith of the debtor, *Id.*; (16) the plan treatment of each creditor to which a direct payment is proposed to be made, *Id.*; (17) the consent, or lack thereof, by the affected creditor to the proposed plan treatment, *Id.*; (18) the ability of the trustee and the court to monitor future direct payments, *Id.*; (19) the potential burden on the trustee, *Id.*; (20) the possible effect upon the trustee's salary or funding the U.S. Trustee system, *Id.*; and (21) the potential for abuse of the bankruptcy system, *Id.*

■ Although there are 21 factors enumerated above, the *Foster* court placed greater emphasis on whether the debtor has been responsible, particularly in his past dealings with creditors and the trustee. *Foster*, 670 F.2d at 487 (citing *In re Wittenmeier*, 4 B.R. 86, 88 (Bankr. M.D.Tenn.1980); *In re Berry*, 5 B.R. 515 (Bankr.S.D.Ohio 1980)). Similarly, this Court will pay particular attention to this

---

**24.** These factors are numerous and counsel should consider each of them when arguing that a debtor should be allowed to make home mortgage payments directly.

**25.** Under 11 U.S.C. § 1322(b), a debtor's plan may not change the amount of the mortgage payments or reduce the amount of the secured claim. This factor is therefore inapplicable here, where the Debtors want to make direct payments to the holders of liens on only principal residences.

factor in assessing the facts germane to each of the Debtors.

■ Moreover, case law is clear that in applying these factors to determine whether a debtor may act as his own disbursing agent, it is improper for the Court to permit debtors to make home mortgage payments directly for the *sole purpose* of avoiding the trustee's percentage fee. *In re Reid,* 179 B.R. 504, 508–09 (E.D.Tex. 1995); *In re Genereux,* 137 B.R. at 413; *In re Harris,* 107 B.R. at 206–07; *In re Sauer,* Case. No. 02–15040DWS, 2004 WL 1043150 at *2 n. 72004 Bankr.LEXIS 600 at *8 n. 7 (Bankr.E.D.Pa.); *See also Cash in a Flash v. Brown,* 229 B.R. 739, 749 (W.D.Tenn.1999) (finding that a debtor's proposed classification is not in good faith when the aim is to avoid paying the trustee's percentage fee on distributions); *In re Delauder,* 189 B.R. 639, 645 (Bankr. E.D.Va.1995) (noting that courts have considered whether debtor's intent is to avoid paying trustee's fees in determining whether debtor's classification is proposed in good faith). The *Reid* court held that "[t]he motivation ... appears to be to avoid the payment of the trustee's fee. In analogous cases, other courts have refused to allow debtors to make periodic payments directly to secured creditors simply to avoid payment of the trustee's fee and circumvent the bankruptcy game." *In re Reid,* 179 B.R. at 508–09 (citing *In re Genereux,* 137 B.R. at 412–13; *In re Harris,* 107 B.R. at 206–07, 209). The potential for abuse and the possible dearth of funding for the trustee system, which is necessary to effectively administer Chapter 13 cases, outweigh the Debtor's interest in avoiding the trustee's fee standing alone. *Id.* The *Genereux* court stated "I am not persuaded that the Debtor's interest in avoiding the Trustee's fee outweighs the interest of debtors (and creditors) generally in an effective and efficient Chapter

13 system." *In re Genereux,* 137 B.R. at 413. This Court agrees with the *Genereux* court and, accordingly, will not allow the Debtors to circumvent the trustee merely to avoid the trustee's fee.

■ Application of these various factors to each of the Debtors leads this Court to conclude that none of them deserve to be allowed to make direct payments to their mortgagees. Mr. and Mrs. Perez were approximately one year behind in their payments (approximately $8,000.00) to their mortgagee at the time they filed their Chapter 13 petition. Their counsel argued that their failure to make these payments did not reflect a lack of responsibility because the defaults were due to Mr. Perez being unemployed and Mrs. Perez being diagnosed with breast cancer, the treatment for which required them to expend sums of money that otherwise would have gone to the mortgagee. While this Court sympathizes with Mrs. Perez's medical condition and Mr. Perez's difficulty in obtaining employment, unemployment is not a legally valid excuse for his failure to make mortgage payments. To reside in a house, one must seek and obtain employment, and then continue to work to generate income sufficient to make home mortgage payments. Mr. and Mrs. Perez have been unable to meet their obligation to their mortgage lender. In addition, when the trustee debited their bank account to collect their very first plan payment, their account had insufficient funds; thus, they fell into immediate default with the trustee. These circumstances do not demonstrate fiscal responsibility. The Debtors' failure to make their first plan payment to the trustee also shows a lack of post-filing compliance with statutory and court imposed duties.

Mr. Lanier's case is even less compelling than that of Mr. and Mrs. Perez. Mr. Lanier resides in a 5,400 square foot house

that has eleven rooms, including five bedrooms, a dining room and a study. His monthly mortgage payments total $3,319.62. When he filed his Chapter 13 petition, he had not made any payments for approximately one year—thus putting him almost $40,000.00 in arrears. He fell into default because he was unemployed. This Court has difficulty sympathizing with a debtor who lives in what most people would classify as a mansion and yet cannot make his mortgage payments because he is unemployed. Perhaps even worse, Mr. Lanier has failed to file tax returns for 2001 and 2004, and his plan provides for no tax payments. The absence of tax returns is a further strike against his request. Additionally, Mr. Lanier's failure to make a single mortgage payment for approximately one year while living in an extravagant house gives rise to serious concerns regarding his good faith and the potential for abuse of the bankruptcy system.

With respect to Mr. Frias and Ms. Bryan, their situation is heartrending in many respects. They fell into default because their daughter required drug rehabilitation, Mr. Frias was bitten by a brown recluse spider, Ms. Bryan needed surgery and suffered a stroke, and their son also needed surgery. All of these problems cost money which otherwise would have gone to their mortgagee. The Court is sympathetic with these problems, and their case for direct payments is the most compelling of all of the Debtors addressed in this Opinion. Unfortunately, these Debtors were fifteen months behind in their payments at the time they filed their Chapter 13 Petition.[26] Additionally, their monthly mortgage payment of $593.00 does not include any monies for payment of taxes and insurance, and they themselves do not have any cash to pay for these necessities. These Debtors have a history of not being able to fulfill their responsibility to their mortgage.

Moreover, the relief requested by these Debtors greatly concerns this Court. They do not want to pay their mortgagee directly. Rather, they want Mr. Frias' employer, Weyerhauser, to remit a portion of his paycheck to the mortgagee. However, this Court has no jurisdiction over Weyerhauser to require such a direct payment. Weyerhauser, unlike the trustee, is not bonded and is not in the business of acting as a disbursing agent and keeping records of such payments.[27] Hence, if Weyerhauser ever failed to remit a payment to the mortgagee, neither the mortgagee nor the trustee would have any recourse against Weyerhauser; or, if they did, such recourse would be in the form of a lawsuit, which requires time and money. Permitting Mr. Frias' employer to make the Debtors' home mortgage payments would severely compromise the ability of the trustee and the Court to monitor the payments. All of these circumstances work against granting the request of Mr. Frias and Ms. Bryan.

Mr. Hatcher's case is not as compelling as that of Mr. Frias and Ms. Bryan. Mr.

---

26. Ms. Bryan testified that the amount of the arrears was $5,000.00, but the proof of claim filed by the mortgagee set forth that the amount of arrears totaled $9,748.93. [Claim No. 5]. The figures set forth in the proof of claim are deemed valid unless the debtor objects to the proof of claim, and the objection is sustained. *See In re Simmons*, 765 F.2d 547, 556 (5th Cir.1985). The Debtors have not objected to this proof of claim. Accordingly, the Court accepts the $9,748.93 figure as the correct amount of arrears on the date of the filing of the Chapter 13 petition.

27. A Chapter 13 trustee must file a bond with the court. 11 U.S.C. § 322. The trustee's bond provides debtors with a remedy in the event that the trustee breaches his duties.

Hatcher had not made any payments for one year when he filed his petition on January 2, 2006, and was in arrears in the approximate amount of $18,000.00. Mr. Hatcher fell behind due to unemployment. Fortunately, Mr. Hatcher eventually found employment. But, as with Mr. Frias and Ms. Bryant, he wants his employer to deduct a portion of his paycheck and remit the mortgagee payment directly to the mortgagee. For the same reasons set forth above with respect to Weyerhauser, this Court declines to grant this request.

Mr. Stewart's situation is worse than that of Mr. Hatcher. When he filed his Chapter 13 petition, Mr. Stewart had not made any payments to his mortgagee for approximately seven months, which left him in arrears of approximately $6,552.00. Unlike Mr. Hatcher, Mr. Stewart was not unemployed; indeed, he has worked for the City of Houston for approximately 24 years and his salary is approximately $43,700.00. His failure to pay his mortgage company was strictly due to his wife's chronic lower back problems, which have resulted in significant medical bills. While the Court sympathizes with the back problems of Mr. Stewart's wife, the Court finds it difficult to avoid the conclusion that Mr. Stewart has been fiscally irresponsible towards his mortgagee. His wife has had lower back problems for years, and yet they purchased their house less than two years ago knowing that his income would not be substantially increasing and also knowing that Ms. Stewart was not working. This was a questionable decision. The facts surrounding the Stewarts' case call into question their degree of fiscal responsibility and their good faith. Considering these factors, as well as the reasons contributing to the Debtors' need for filing a Chapter 13 petition and plan, and in the absence of exceptional circumstances, this Court determines that the Stewarts are not permitted to bypass the trustee and make payments directly to their mortgage.

To be sure, there are some of the 21 factors that favor some or all of the Debtors in their quest for being allowed to make direct payments. For example, some of them may not be able to reorganize if they have to pay the 10 percent fee to the trustee; and while this Court may not allow them to make direct payments solely on the grounds that their respective plans will not be feasible if they have to pay the fee, the Court may consider this point if there are other factors in the Debtors' favor. Here, the Perezes will have to pay monthly fees of $66.00; Mr. Lanier will have to pay approximately $332.00 in monthly fees; Mr. Frias and Ms. Bryan will have to pay $59.30 per month; Mr. Hatcher will have to pay $98.50 in monthly fees; and Mr. Stewart will have to pay $120.00 per month. These are all relatively substantial sums of money for each of these Debtors.[28] Unfortunately for the Debtors, there are not too many other factors in their favor. There

---

28. Although the sums may be substantial to the Debtors, the Court notes that each of them will still have positive monthly net income after payment of the monthly fee to the trustee. (See Appendix D, attached hereto, which was compiled by reference to the Debtors' testimony and the most recently filed Schedules J and I for each Debtor.) Further, a review of each of the Debtor's Form B22C's shows that, with one exception, the actual average monthly income is in the same range as the income figures set forth in the Debtor's Schedule I's. The only exception is Mr. Lanier, whose Form B22C reflects monthly income of $4,950.13 while his Schedule I figure is $8,784.94. [Docket Nos. 8, 39]. Accordingly, all of the figures reflect that all but one of the Debtors can afford to pay the trustee's fee. Mr. Lanier's inflating his projected income casts doubt on his credibility and the feasibility of his plan even without paying the fee.

is no question that all of their mortgage companies—ABN AMRO Mortgage Group, Bank of America, America's Servicing Company, Colonial Savings, and Countrywide—are sophisticated lenders. This factor favors the Debtors because such lenders certainly have the resources to protect their interests.[29] And, some of these Debtors have shown unique or special circumstances, such as Ms. Bryan and Mr. Frias, whose finances have certainly been hampered by the multiple medical problems encountered by several members of their family. Finally, none of the mortgagees have lodged objections to direct payment. While, at first blush, this absence of objections might appear to favor the Debtors' position, this Court is not so sure. The poor record-keeping of both debtors and mortgagees has frequently led to post-confirmation problems when mortgagees contend at the end of the plan that the debtor is in default while the debtor retorts that all payments have been made. Using the trustee as the disbursing agent will prevent such problems, as trustees typically keep impeccable records.

 On the other hand, aside from several factors already discussed above that work against the Debtors, there are other factors that also undermine the Debtors' position. For example, all of their debts are consumer debts, not commercial debts. It seems to this Court that the more that the debt can be considered a commercial obligation, the stronger the case can be made that direct payments should be allowed. A business Chapter 13 debtor is more likely to pay his major secured creditor for fear of having financing cut off and thereby forcing a shut down of the business operations.

Second, all three trustees in the Houston Division have vehemently opposed the relief sought by the Debtors. These trustees are adamant that direct payments impair their ability to perform their duties, including the duty to ensure that all claims are paid and that each plan is feasible when confirmed and remains feasible after confirmation. In the cases at bar, all of the Debtors want to make direct payments for 57–60 months—periods of time that tax the resources of the trustees attempting to monitor whether the Debtors are staying current with their mortgages. Moreover, all three trustees in the Houston Division will be able to make monthly distributions to mortgagees, so there will not be any undue delay in remitting payments. These trustees are also adamant that without receiving fees, they have a much greater burden in fulfilling their duties because they lack the financial means to hire sufficient personnel to help carry out these duties.

Finally, the trustees vociferously argue that the practice of allowing debtors to make direct payments to mortgage companies and vehicle lenders has led to abuse of the Chapter 13 system. Specifically, the trustees contend that this practice has resulted in prolonged and expensive legal proceedings—including the filing of motions to lift the automatic stay, motions to modify the plan, and trustees' motions to dismiss—whenever the income of the direct-paying debtor declines (for whatever reason). When the debtor discovers that he has insufficient cash to completely pay the trustee, the home lender, and the vehi-

---

**29.** While lenders generally have the *resources* to protect their interests, this Court wonders on some days just how much *ability* certain mortgagees have to monitor their payments. Since taking the bench approximately 15 months ago, the undersigned judge has been surprised at how often mortgagees have been unable to determine how many payments they have received from their borrowers/debtors.

cle lender, the debtor will pay one and not the other two, or pay two and not the third, or make partial payments to all three. The result is that the lenders file motions to lift stay, the debtors file motions to modify the plan, and the trustees file motions to dismiss, many of which motions are then continued or withdrawn when the debtor, on the eve of the scheduled hearing, manages to produce sufficient funds to cure the default—only to fall behind again the next month. In short, the practice that has developed of routinely allowing debtors to make direct payments has produced an environment whereby debtors whose income declines can nevertheless remain in Chapter 13 by playing a shell game—with the insufficient cash representing the pea and the trustee, the home lender, and the car lender representing the shells. The consequences of this shell game are that the Chapter 13 system has become a motion-driven system that focuses insufficient attention on whether a proposed plan is feasible and whether a confirmed plan maintains its feasibility and requires the trustees, debtors, creditors, and the Court, to spend excessive time dealing with a deluge of motions to lift stay, motions to modify plans, and motions to dismiss. And the most tragic consequence of this situation is the burden it puts on debtors who, as noted above, pay $1,000.00 or more in additional expenses for every motion to lift stay, or lose their homes if they cannot pay the additional sums.

All in all, when reviewing the 21 factors, and when placing particular emphasis on whether the Debtors have been responsible in prepetition dealing with their creditors by timely making payments on their mortgages, this Court concludes that on balance, the factors weigh against granting the relief sought by the Debtors.

## V. CONCLUSION

Over the past quarter century, since passage of the Bankruptcy Reform Act of 1978, a pattern has developed in Chapter 13 cases in which debtors in this district have been allowed to make their mortgage and vehicle payments directly to their home and vehicle lenders while also making their plan payments to the trustee. The consequences of this practice have led to an abuse of the system whereby those debtors with insufficient cash flow play the trustee, the mortgage lender, and the vehicle lender against one another by making some payments to each of them in one month and no payments to some of them in another month. The system is broken and needs to be fixed. And as noted by Mr. Bermant in the research cited previously, bankruptcy courts across the country have increasingly required payment of mortgage notes through the Chapter 13 trustee to remedy the problem.

The principal argument against payment of mortgages through a Chapter 13 trustee is that debtors must pay the Chapter 13 trustee's fee for any payments made through the trustee. But when one considers the cost to debtors of attorney's fees from multiple motions to lift stay and motions to dismiss, it is questionable whether the fee to the trustee is actually a greater cost. From 2000 to 2003, the amount of fees disbursed under the plan to Chapter 13 attorneys was 1.5 times the amount paid to operate Chapter 13 trustee's offices.[30] Gordon Bermant, *Trends in Chapter 13 Disbursements*, FEB–24 AM. BANKR. INST. J. 20 (2005) [App. E]. The argument that the trustee's fee is a substantial cost

---

**30.** The attorneys' fees paid under the plan do not include all attorneys' fees paid to debtor's counsel because a substantial amount of at-torneys' fees is paid prior to the filing of the case.

to the debtor fails to consider the cost to the debtor of dealing with multiple motions to lift stay, motions to dismiss, and related motions to modify plans, all of which motions are filed much more frequently in those cases where the debtor is making direct payments to the mortgagee.

The argument also fails to recognize that as mortgage payments are made through the trustee, the trustee's percentage fee is reduced. Chapter 13 trustee's fees are fixed by the Attorney General. These fees are based on the amount that the Attorney General allows the trustee as a budget for the expenses of operating the office and the estimated payments that the trustee will handle during the year. The percentage fee is a fraction: the numerator is the trustee's budget and the denominator is the estimated payments that the trustee will handle. If mortgage payments are made through the trustee, the numerator increases only marginally, while the denominator increases substantially. Therefore, the percentage fee is reduced substantially.

The implementation of Local Rule 3015(b) and the Home Mortgage Payment Procedures in the Southern District of Texas is an attempt to repair the damage that has been done to the system. By requiring debtors to make all of their payments through the trustee, debtors will no longer be able to play the shell game. Either the debtor will have sufficient funds to pay the trustee, or he will not have sufficient funds; and if he does not, he will not be allowed to prolong his Chapter 13 case. The trustee will be able to know immediately whether the existing plan is

feasible—and this is exactly where the focus should be.

This approach will not only serve to more effectively monitor debtors; it will also serve to more effectively police home lenders. In recent years, mortgages have increasingly been packaged and sold, and then resold, and then resold again. One detrimental consequence of this trend has been loss of payment records by mortgagees and servicing agents. And, a detrimental consequence of this poor record keeping has been an increasing number of motions to lift stay that contain incorrect allegations about whether the debtor is in default and, if so, by how many payments.[31] Because many debtors themselves fail to keep accurate records of when and how much they have paid their home lenders, this Court has found itself increasingly dealing with movants and respondents who cannot prove, with any degree of accuracy, how many payments the debtor has made and when the mortgage company has received the payments. Chapter 13 trustees keep excellent records. By requiring debtors to make their mortgage payments to these trustees, and by having the trustees remit these payments to the mortgagees, there will be much fewer questions, and much greater accuracy, about how much was paid to the home lender and when payment was remitted.

This clear evidence of payments also substantially benefits debtors upon completion of their cases. The procedures unanimously adopted by the bankruptcy judges of the Southern District of Texas achieve certainty, at the end of the case, that the mortgage is current because there

---

**31.** Aside from poor record keeping, this Court has also noticed that counsel for mortgagees have had difficulty understanding and explaining what records their clients do provide them to bring to court. Indeed, at one hearing on a motion to lift stay, when this Court

inquired of movant's counsel whether he could explain the payment history that he was attempting to introduce as an exhibit, he conceded that he could not do so because the figures shown therein were—to quote him exactly—"rocket science."

is a record that all payments have been made during the case. Without such a record, it is quite common for the mortgage lender to assert that the mortgage is not current because of various allegedly missed payments during the case—shortages for tax and insurance escrows, late payments, penalties, and fees. Normally, the debtor cannot prove that the payments have been made because the debtor has no records. The usual result is that the debtor either loses the homestead or else the debtor is forced to file another bankruptcy case.

The Debtors complain that the trustee is nothing more than a glorified check-writer and that the fee that has to be paid to the trustee is grossly excessive for this check writing service. Given the amount of confusion that has arisen from poor record keeping by both debtors and mortgage companies, this Court disagrees that the fee is unjustified even if the trustee's only duty was to write checks to claimants. However, this is not the trustee's only duty. Contrary to the Debtors' myopic view of trustees, they perform many functions in addition to disbursing funds to creditors.

A Chapter 13 trustee is also charged with the duty to be accountable for all property which he or she receives; to investigate the debtor's financial affairs; to examine proofs of claims and object to improper claims; to oppose the debtor's discharge if necessary; to furnish information upon the request of a party in interest concerning the administration of the estate; to appear and be heard at any hearing concerning such issues as the value of property subject to a lien and/or confirmation or modification of a plan; to advise and assist the debtor in performance; and, if the debtor is engaged in a business, the trustee has the further duty to investigate the financial affairs of the business and file

a statement concerning the trustee's investigation of the debtor's business. 11 U.S.C. §§ 707, 1302.

> While the court recognizes that the trustee's commission on distributions is sometimes a significant tax on a debtor's ability to repay his debts, the court also recognizes that the chapter 13 trustee is not merely a disbursing agent. Chapter 13 trustees perform valuable services both for the debtor and the creditors by assisting debtors in proposing plans, objecting to improper claims, providing ongoing advice to the debtor during the life of the plan, responding to requests for plan modifications or requests for temporary suspension of payments when debtors experience financial difficulties, and responding to creditor inquiries.

*In re Delauder,* 189 B.R. at 645 n. 8. The Chapter 13 standing trustee is involved in every phase of the process and is a vital component to the success of a debtor's confirmation, and ultimately, discharge. *See In re Reyes,* 106 B.R. 155, app. at 159 (Bankr.N.D.Ill.1989) (The Honorable Judith A. Boulden of the Bankruptcy Court for the District of Utah attributes the success of debtors' plans and Chapter 13, in general, to the standing trustees whose "vital role" has made them "engineers of that success."). Accordingly, the fees paid to the trustees are easily justifiable. The trustees need qualified personnel, including attorneys and legal assistants, and updated technology to properly and promptly perform all of these tasks; and the fees received from debtors provide the means to accomplish these objectives.

The Debtors' request that the Court grant them special treatment by allowing them to avoid the trustee's fee is unfair. In general, Chapter 13 debtors are required to pay the trustee's fee. If the bankruptcy courts are to administer Chapter 13 cases fairly and equitably, this

Court cannot require some debtors to make home mortgage payments through the trustee and to pay the trustee's fee while simultaneously permitting other debtors and their creditors to avoid the expense of the trustee's fee. Such a policy is inequitable and unjust because not only do the other debtors who pay the trustee's fee shoulder the costs of funding the Chapter 13 system, the creditors of those debtors receive less than the creditors of debtors who make direct payments.

 Local Rule 3015 and the Procedures provide that a debtor may seek this Court's permission to make direct payments. Indeed, 11 U.S.C. § 1326(c) expressly allows for the debtor, or any other third party, to make payments to creditors under the plan—although case law is clear that this can be done only with this Court's approval. *See Foster,* 670 F.2d at 486. Accordingly, this Memorandum Opinion is not meant to issue a Shermanesque statement that this Court will never grant a debtor such permission. Rather, this Memorandum is meant to serve notice that in the Southern District of Texas, direct payments by a debtor are now the exception rather than the rule, and that the debtor must satisfy the various elements set forth in the applicable case law to obtain approval for direct payments. This shift will improve accountability, promote a greater focus on feasibility, and reduce the filing of motions to lift stay and motions to dismiss. If these changes occur even in some small measure, then the Chapter 13 system will benefit.

All of the Debtors in the cases at bar have failed to satisfy the necessary elements to obtain a waiver of Local Rule 3015 and the Procedures. Other debtors may well be able to do so, and whenever any debtor files the appropriate motion seeking such relief, this Court will assuredly provide an expeditious hearing to resolve the issue, one way or the other, so that the plan confirmation process will not be delayed.

 Finally, the Debtors, as an alternative form of relief, have requested this Court to enter an order that the Debtors do not have to pay a fee to the trustee even if they are required to pay their monthly mortgage payments through the trustee. The Debtors characterized this alternative relief as the "Tennessee Plan" because in the Volunteer State, trustees apparently do not take their fees and yet are still willing to make the mortgage payments. This Court has no power to grant the Debtors' request. The United States Attorney General, not this Court, is vested with the power to determine how much of a fee (not exceeding 10 percent) each Chapter 13 trustee shall be entitled to receive. 28 U.S.C. § 586(e). Accordingly, this Court must deny the alternative relief requested by the Debtors.

A separate order denying the relief sought by the Debtors shall be entered on the docket in each of their respective cases simultaneously with the entry of this Memorandum Opinion on the docket.