[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 16-16513

_____

D.C. Docket Nos. 2:15-cv-00420-SPC; 9:09-bkc-02778-FMD

IN RE: MILDRED M. DUKES,

Debtor.

---------------------------------------------------------------------------------------------------

MILDRED M. DUKES,

Plaintiff-Appellant,

versus

SUNCOAST CREDIT UNION,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(December 6, 2018)

Before JILL PRYOR and JULIE CARNES, Circuit Judges, and CONWAY,[*] District Judge.

JULIE CARNES, Circuit Judge:

Mildred M. Dukes ("Debtor") filed for Chapter 13 bankruptcy in 2009, and the bankruptcy court confirmed her bankruptcy plan in 2010. At the time her plan was confirmed, Debtor had two outstanding mortgages with Suncoast Credit Union ("the Credit Union"). Debtor's plan did not address the Credit Union's mortgages aside from stating that Debtor would make payments directly to the Credit Union, not through the bankruptcy trustee. The plan did not specify repayment terms for the mortgages, did not set a schedule for repayments, and did not make any changes to the mortgages' terms. When her plan was confirmed, Debtor was current on her payments to the Credit Union.

Debtor made the required payments under her bankruptcy plan, and, in 2012, Debtor made her last payment for her bankruptcy. Accordingly, the bankruptcy court discharged "all debts provided for by the plan." 11 U.S.C. § 1328(a).

Debtor, however, had defaulted on her mortgage payments to the Credit Union in 2011. In 2013, the Credit Union foreclosed on Debtor's home under the second mortgage and sought a judgment against Debtor for the remainder on the

---

[*] Honorable Anne C. Conway, United States District Judge for the Middle District of Florida, sitting by designation.

first mortgage.  In 2014, the Credit Union moved to reopen the bankruptcy proceeding and begin an adversary proceeding to declare that Debtor's personal liability on the first mortgage had not been discharged.

The bankruptcy court and the district court, hearing the initial appeal, both concluded that the first mortgage was not discharged because it was not "provided for" by Debtor's bankruptcy plan.  Both also found that, even if the mortgage was "provided for," the discharge did not include the debt for other reasons, including because discharge would violate 11 U.S.C. § 1322(b)(2), which prohibits a plan from "modify[ing] the rights of holders of . . . a claim secured only by a security interest in real property that is the debtor's principal residence."

On appeal, Debtor contends that both the bankruptcy court and the district court erred in holding that the plan did not "provide for" the Credit Union's mortgage and that discharge was prohibited by § 1322(b)(2).  Debtor also asserts that the mortgage was discharged because the Credit Union failed to file a proof of claim for it.

We affirm the bankruptcy court and district court and hold that Debtor's plan did not discharge the Credit Union's mortgage.  In doing so, we hold that, for a debt to be "provided for" by a plan under § 1328(a), the plan must make a provision for or stipulate to the debt in the plan.  Because Debtor's plan did

3

nothing more than state that the Credit Union's mortgage would be paid outside the plan, it was not "provided for" and was not discharged.  Even if it was provided for, we hold that discharge of the Credit Union's debt would violate § 1322(b)(2) by modifying the Credit Union's right under the original loan documents to obtain a deficiency judgment against Debtor.  We also hold that the issue of whether the Credit Union's failure to file a proof of claim for its first mortgage resulted in the mortgage's discharge was not preserved for appeal because Debtor did not raise it before the bankruptcy court, and, alternatively, that failure to file a proof of claim did not discharge the Credit Union's mortgage because, again, discharge would violate § 1322(b)(2).

## I.    BACKGROUND

### A.    Factual Background

Debtor's first mortgage with the Credit Union was taken out in 1989 and her second mortgage was taken out in 2007.  Together, the mortgages total roughly $150,000 and mature in 2022.  On February 18, 2009, Debtor filed for Chapter 13 bankruptcy.  In her bankruptcy schedules, Debtor listed the Credit Union—then Suncoast Schools Federal Credit Union—as the holder of both the first and second mortgages on her primary residence.  At the time Debtor filed for bankruptcy, she was current on her payments for both mortgages.  During the bankruptcy

4

proceeding, the Credit Union filed a proof of claim only for the second mortgage (with a balance of approximately $77,000), not the first.

Debtor's plan includes a number of sections potentially relevant to the Credit Union's mortgages. Specifically, the plan lists the amount for the adequate protection payments required under the Bankruptcy Code. *See* 11 U.S.C. § 1326(a)(1)(C). The plan and its implementing orders further state that no money would be paid through the plan to the Credit Union, meaning that any payments made on the Credit Union's mortgages will be made directly to the Credit Union, not through the bankruptcy trustee. The plan does not set repayment terms for the Credit Union's mortgages, identify a repayment schedule, or otherwise mention the mortgages.

First, the plan states that "All secured creditors, except as provided otherwise herein, including mortgage creditors, must be paid through the plan as part of the plan payment to the Chapter 13 Trustee." Next, the part of the plan titled "Secured Claims," addresses adequate protection payments:

> (A) Pre-Confirmation Adequate Protection Payments: No later than 30 days after the date of the filing of this Plan or the Order for Relief, whichever is earlier, the Debtor(s) shall make the following adequate protection payments to creditors pursuant to §1326(a)(1)(C). . . . If Debtor(s) elects to make such adequate protection payments directly to the creditor, and such creditor is not otherwise paid through the Plan, such payments shall constitute adequate protection.

5

Following this and under the heading "Paid directly to the Creditor," the plan includes the following entries:

| Creditor | Total Est. Claim | Direct Ad. Prot. Pay. |
|---|---|---|
| **Suncoast Schools FCU** | **$79000.00** | **$611.00** |
| **Suncoast Schools FCU** | **$77671.00** | **$1,040.00** |

Part (B) of the same section addresses "Claims Secured by Real Property Which Debtor(s) Intends to Retain / Mortgage Payments Paid Through the Plan." The Credit Union's mortgages presumptively fit into this category. But, in the section where Debtor could have elected to have the Trustee "pay the post-petition mortgage payments" on Debtor's behalf, Debtor wrote "N/A."

The plan concludes with a calculation of the total debt burden under the plan's payment schedule. This calculation includes a dividend of $3,600 to unsecured creditors, attorneys' fees totaling $1,500, and a trustee's fee of $566.60, for a total of $5,666.66 to be paid off in thirty-six installments over an estimated three years.[1] None of this money goes to pay off the roughly $150,000 Debtor owed on the Credit Union's mortgages.

When Debtor filed her Chapter 13 petition, an automatic stay went into effect that prevented any creditor, including the Credit Union, from foreclosing on

---

[1] Although these totals only add up to $5,666.60, the plan states that the grand total is $5,666.66.

6

Debtor's property.  *See* 11 U.S.C. § 362(a).  Shortly after she filed the plan, Debtor

moved for authorization to make her mortgage payments directly to the Credit

Union.  The bankruptcy court granted her request and issued two orders

authorizing direct payments to the Credit Union for both the first and second

mortgages.  The orders accordingly terminated the automatic stay against the

Credit Union for its mortgages, permitting it "to seek *in rem* relief against the

property securing [the Credit Union's] claim[s]."

The Credit Union did not object to the plan, and the bankruptcy court

confirmed it in May 2010.  Shortly thereafter, the court issued a follow-up order

identifying the claims that would be allowed and ordering disbursement pursuant

to the plan.  The Credit Union's first mortgage was omitted from this order, as no

proof of claim had been filed.  The order listed the second mortgage (for which a

proof of claim was properly filed) in "Exhibit D" as "hereby allowed," but noted

that "the Trustee shall not make distribution upon such claims" under the

confirmed plan.

Thus, at each point in the bankruptcy proceeding, Debtor intended—and was

granted the right—to make payments on the first and second mortgages directly to

the Credit Union "rather than through the Chapter 13 Trustee."  In fact, the

implementing order specifically stated that the Credit Union "SHALL NOT

7

RECEIVE ANY PAYMENT FROM THE CHAPTER 13 TRUSTEE UNDER THE CONFIRMED PLAN." Thus, Debtor's performance of her monthly installment obligations under the plan would do nothing to pay down her mortgage debt owed to the Credit Union.

Once the plan was confirmed, Debtor began making payments to the trustee. She timely made her thirty-six payment obligations and, upon completion, the bankruptcy court discharged "all debts provided for by the plan" in March 2012, under 11 U.S.C. § 1328(a).

During this same time period, Debtor made a few of the scheduled payments to the Credit Union on her mortgages but stopped paying altogether in 2011. Both mortgages entered default. In 2013, the Credit Union foreclosed on Debtor's home under the second mortgage and sought a personal judgment against Debtor on the first.

## B.     Procedural History

In 2014, the Credit Union moved to reopen the bankruptcy case and commenced an adversary proceeding seeking a determination that Debtor's personal liability on the first mortgage had not been discharged. Both parties moved for summary judgment. The bankruptcy court granted summary judgment to the Credit Union and concluded that the Credit Union's mortgage had not been

8

discharged because it was not "provided for" by the plan, as it was paid outside the plan and unaffected by the plan itself.  The bankruptcy court also held that, even if the mortgage was provided for, the antimodification provision in § 1322(b)(2) prohibited the discharge from modifying the Credit Union's right to a deficiency judgment and the claim constituted "long-term debt" exempted from discharge under § 1322(b)(5).  *See* 11 U.S.C. § 1328(a)(1).  Debtor appealed to the district court under 28 U.S.C. § 158(a).  Debtor contended that the bankruptcy court erred in ruling for the Credit Union, and, for the first time, asserted that the Credit Union's failure to file a proof of claim for the first mortgage meant that it had been discharged—regardless of whether it was "provided for" by the plan.  The district court rejected Debtor's proof of claim argument as waived and affirmed the bankruptcy court on all grounds.  Debtor filed this appeal.

## II.    STANDARD OF REVIEW

In a bankruptcy appeal, this Court functions as a second reviewer of the bankruptcy court's rulings and applies the same standards as the district court. *Brown v. Gore (In re Brown)*, 742 F.3d 1309, 1315 (11th Cir. 2014).  Conclusions of law are reviewed *de novo*, and findings of fact are reviewed for clear error.  *Id.*

9

## III.    DISCUSSION

Debtor asserts that the bankruptcy court's discharge under 11 U.S.C. § 1328(a) of "all debts provided for by the plan" included the Credit Union's first mortgage because the plan mentioned that the mortgage would be paid outside the plan "rather than through the Chapter 13 Trustee."  In essence, Debtor contends that mere reference to the Credit Union's debt is sufficient for it to be "provided for" by the plan.  We disagree.  Supreme Court precedent defines "provided for" more narrowly to require that the plan either stipulate to or make a provision for the debt.  In other words, the plan's terms must, in some way, affect or govern the debt's repayment.  By stating only that Debtor would make any payments to the Credit Union directly, Debtor chose not to handle the Credit Union's debt through her bankruptcy.  Notably, other courts addressing this issue have reached the same conclusion:  a plan's mere statement that payments on a debt will be made outside the plan does not mean that debt is "provided for" by the plan.  Even if the Credit Union's debt was provided for by the plan, we also hold that, because the Credit Union's claim was secured by Debtor's primary residence, the antimodification

10

provision of 11 U.S.C. § 1322(b)(2) prohibits the mortgage from being discharged.[2]

Debtor also argues that, regardless of whether the Credit Union's mortgage was provided for by the plan, it was discharged because the Credit Union failed to file a proof of claim for it.  This argument was not raised before the bankruptcy court and therefore was not properly preserved for appeal.  Even if considered, § 1322(b)(2) prohibits discharge in spite of the Credit Union's failure to file a proof of claim.

### A.    Whether the Plan "Provided for" the Credit Union's Mortgage

Debtor asserts that the Credit Union's first mortgage was discharged because the plan "provided for" it by stating that it would be paid outside the plan.  The Credit Union contends—and the bankruptcy court and district court agreed—that mere reference to the mortgage is insufficient for the plan to have "provided for" it, so the debt was not discharged.  After careful review, we agree with the Credit Union, the district court, and the bankruptcy court.

#### 1.    Defining "provided for" in § 1328(a)

---

[2]  Both parties also raised the issue of whether the Credit Union's mortgage was exempt from discharge as long-term debt under § 1322(b)(5).  *See* 11 U.S.C. § 1328(a)(1).  We do not address this issue because it is unnecessary for the resolution of this appeal.

The bankruptcy court's discharge covered "all debts provided for by the plan." 11 U.S.C. § 1328(a). The plan itself does not set forth a payment schedule or modify the terms for the Credit Union's mortgage. The plan and its implementing order do, however, expressly state that any mortgage payments will be made directly to the Credit Union "rather than through the Chapter 13 Trustee." The question before us then is whether the plan's reference to the Credit Union's mortgage as being paid outside the plan means that the mortgage was "provided for" by the plan and thereby included in the discharge. So, as a matter of first impression, we must determine the meaning of "provided for" in § 1328(a).

"When construing the language of a statute, we 'begin [ ] where all such inquiries must begin: with the language of the statute itself,' and we give effect to the plain terms of the statute." *Valone v. Waage (In re Valone)*, 784 F.3d 1398, 1402 (11th Cir. 2015) (alteration in original) (quoting *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989)). In doing so, "we read the statute to give full effect to each of its provisions . . . [and] look to the entire statutory context." *Davidson v. Capital One Bank (USA), N.A.*, 797 F.3d 1309, 1315 (11th Cir. 2015) (alteration in original) (quoting *United States v. DBB, Inc.*, 180 F.3d 1277, 1281 (11th Cir. 1999)).

12

In determining the meaning of "provided for" in § 1328(a), we do not write on a clean slate. In *Rake v. Wade*, the Supreme Court interpreted the phrase "provided for" in § 1325(a)(5) of the Bankruptcy Code. 508 U.S. 464 (1993). Because "[a] word or phrase is presumed to bear the same meaning throughout a text," *Appling v. Lamar, Archer & Cofrin, LLP (In re Appling)*, 848 F.3d 953, 958 (11th Cir. 2017) (alteration in original) (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 170 (2012)), *aff'd*, 138 S. Ct. 1752 (2018), the Supreme Court's interpretation of "provided for" in § 1325(a)(5) necessarily informs our interpretation of "provided for" in § 1328(a).

In *Rake*, the debtors filed for Chapter 13 bankruptcy while in default on their home mortgages, and their bankruptcy plans proposed to cure the defaults through repayment schedules that would be administered inside the plans. 508 U.S. at 466–67. Future payments of principal and interest on the mortgages, however, would be paid directly to the creditor. *Id*. The debtors argued that the arrearages (overdue debts) were not provided for by the plan and therefore did not have to comply with the requirements of § 1325(a)(5) to include postconfirmation interest. *Id*. at 472. The Supreme Court disagreed. The Court determined that "[t]he most natural reading of the phrase to 'provid[e] for by the plan' is to 'make a provision for' or 'stipulate to' something in a plan." *Id.* at 473 (second alteration in original)

13

(citing American Heritage Dictionary 1053 (10th ed. 1981)).  Applying this definition, the Court concluded that the bankruptcy plans "clearly 'provided for' respondent's home mortgage claims by establishing repayment schedules for the satisfaction of the arrearages portion of those claims."  *Id.*  Importantly, the Court acknowledged that the plans split the debt into two separate claims:  "the underlying debt and the arrearages."  *Id.*  "While payments of principal and interest on the underlying debts were simply 'maintained' according to the terms of the mortgage documents during the pendency of petitioners' cases, each plan treated the arrearages as a distinct claim to be paid off within the life of the plan pursuant to repayment schedules established by the plans."  *Id.*  Hence the Court concluded that the arrearages were "provided for" by the plans and the creditor was entitled to interest under § 1325(a)(5).  *Id.*

   *Rake* teaches two critical lessons that apply here.  First, "provided for" by the plan means to "make a provision for" or "stipulate to" something in the plan. *Id.*  Here, Debtor's plan neither made provisions for, nor stipulated to, anything regarding the Credit Union's mortgage.  Unlike the plan in *Rake*, Debtor's plan did not set forth any repayment terms for any portion of the Credit Union's mortgage. Instead, the plan merely stated that the Credit Union's mortgage would be paid

14

outside the plan—nothing more.[3]  The statement that Debtor was to make

payments directly to the Credit Union was merely a clarification of what was

included and what was excluded from the plan.  It could not be used, either by

Debtor or the Credit Union, to enforce any rights regarding repayment of the

mortgage because it created none.  By failing to set forth any terms governing

repayment of the Credit Union's mortgage, the plan did not "provide for" it.

Second, *Rake*'s distinction between the two claims for underlying debt and

arrearages is instructive here.  Under the Supreme Court's analysis, the arrearages

on the mortgages were "'provided for' by the plan[s]" because they were to be

"paid off within the life of the plans pursuant to repayment schedules *established*

---

[3]  Debtor also contends that the plan's terms setting forth the adequate protection payment amounts for the Credit Union show that the mortgage was "provided for."  Adequate protection payments, however, have nothing to do with the repayment of a debt.  Adequate protection payments are required by the Bankruptcy Code to protect the value of secured creditors' collateral while the creditor is unable to enforce a lien on the debtor's property during the bankruptcy.  *See* 11 U.S.C. § 1326(a)(1)(C); *In re Robson*, 369 B.R. 377, 379–80 (Bankr. N.D. Ill. 2007) (describing the history behind § 1326(a)(1)(C) and how it is designed to protect secured creditors from depreciation).  Hence, if they meet the statutory criteria, secured creditors have a right to adequate protection.  *See In re Warrington*, 424 B.R. 186, 191 (Bankr. E.D. Pa. 2010).  Adequate protection payments are wholly different from maintenance payments due under the original loans or payments made under a bankruptcy plan.  *See In re Perez*, 339 B.R. 385, 398–99 (Bankr. S.D. Tex. 2006) (describing how "[a]dequate protection payments to real estate lien holders are not payments made under a proposed plan"); *In re Cook*, 205 B.R. 437, 440 (Bankr. N.D. Fla. 1997) ("[A]dequate protection payments do not constitute payments under a plan.").  As a result, the debtor can be required to provide adequate protection payment to any secured creditor unable to enforce its lien, even if the creditor's debt is not treated or repaid under the plan.  *See Perez*, 339 B.R. at 400–01 (acknowledging that, although Chapter 13 bankruptcy could not modify a mortgage lender's rights, the lender was still entitled to adequate protection).

15

*by the plans*." *Id.* (emphasis added). By contrast, the underlying debts paid outside the plan "were simply 'maintained' according to the terms of the mortgage documents." *Id.* Although the Court did not address whether the underlying debts were "provided for by the plan," its analysis suggests that claims wholly governed by the original loan instruments—rather than the terms of the bankruptcy plan— are not "provided for by the plan" in the sense Chapter 13 contemplates.

Applying this here, we find that, by doing nothing more than mentioning that the Credit Union's mortgage would be paid outside the plan, the plan did not "provide for" the mortgage. The underlying debts paid outside the plan in *Rake* that were merely "maintained" are analogous to the Credit Union's mortgage here. And, again, the plan did not set a repayment schedule for the mortgage and did not establish any repayment terms. The plan simply stated that Debtor would make any payments directly to the Credit Union. The Credit Union's rights and Debtor's liability remained governed solely by the original loan documents. By neither stipulating to nor making provisions for the Credit Union's mortgage, the plan did not "provide for" it, and the mortgage was not included in the discharge under § 1328(a).

In arguing otherwise, Debtor reads *Rake* far too broadly to support her position that mere reference to the mortgage is sufficient for the plan to "provide

16

for" it.  Debtor relies on dicta from *Rake* that, "[a]s used in § 1328(a), ['provided for by the plan'] is commonly understood to mean that a plan 'makes a provision' for, 'deals with,' or even 'refers to' a claim."  *Id.* at 474 (citing 5 Collier on Bankruptcy ¶ 1328.01, at 1328–29 (15th ed. 1993)).  Yet, as the discussion above shows, *Rake* does not stand for the proposition that a plan "provides for" a claim merely by mentioning it.  To the contrary, it suggests that a claim is "provided for" where the plan supplies terms that will govern the repayment of the claim.  Dicta from *Rake*, unmoored from the Court's actual holding and analysis, is not persuasive.

### 2.    Debtor's plan in the context of Chapter 13

Reviewing Debtor's plan in the context of Chapter 13 bankruptcy confirms that the Credit Union's mortgage was not "provided for" by the plan.  Chapter 13 prohibits the modification of a secured claim unless the debtor either provides value to the secured creditor or the secured creditor consents.  And creditors' rights on claims secured by the debtor's primary residence are expressly prohibited from being modified.  Further, Chapter 13 plans last no longer than five years.  So, likely because Chapter 13 bankruptcy is particularly ill-suited for most debtors who have long-term mortgage debt due to the inability to either modify such debt or repay it on an accelerated five-year schedule, Debtor chose not to address the

17

Credit Union's mortgage in her plan. The simplest conclusion then is that Debtor's plan, by not addressing the Credit Union's mortgage, did not "provide for" it.

The goal of a Chapter 13 bankruptcy is to aggregate the debtor's outstanding debts, create a repayment plan for those debts, and prescribe the order, manner, and terms of repayment. The plan is proposed by the debtor, is subject to approval by certain classes of creditors, and must ultimately be confirmed by the bankruptcy court under a specific set of criteria. *See* 11 U.S.C. § 1325.

The Chapter 13 plan takes stock of the allowed claims of both secured and unsecured creditors, ranks creditors in order of their priority, and creates a repayment plan to be administered by an assigned trustee. *See id.* § 1302. The plan must provide for the repayment of debts over a period of no longer than five years. *Id.* § 1322(d). And "as soon as practicable after completion by the debtor of all payments under the plan," the bankruptcy court "shall grant the debtor a discharge of all debts provided for by the plan." *Id.* § 1328(a).

Generally, under these criteria, a Chapter 13 plan may "modify the rights of holders of secured claims" or simply leave them "unaffected," thus allowing the terms of the original loan agreements to govern the debtor's obligations. *See id.* § 1322(b)(2). The plan cannot, however, unilaterally deprive secured creditors of their rights. To modify a secured creditor's claim, a plan must meet at least one of

18

three criteria: (1) the holder of a secured claim must accept the plan; (2) the plan must provide that the secured creditor will receive the full value of the secured claim and will not lose its security interest in the debtor's property until the claim is paid; or (3) the debtor must surrender the collateral. *See id.* § 1325(a)(5). In other words, the plan may not give the secured creditor less than the value of its claim, or otherwise force it to accept a modification of the debt obligation (such as a change in interest rate or maturity date), unless the creditor specifically consents.

The antimodification provision in § 1322(b)(2) goes even further and expressly prohibits a plan from modifying "the rights of holders of . . . a claim secured only by a security interest in real property that is the debtor's principal residence." The Supreme Court has clarified that the "rights" protected by § 1322(b)(2) "are reflected in the relevant mortgage instruments" and are governed by state law. *Nobelman v. Am. Sav. Bank*, 508 U.S. 324, 329 (1993).[4] A debtor can, however, cure arrears on mortgage debt without violating the antimodification

---

[4] In *Nobelman*, those rights included:

> the right to repayment of the principal in monthly installments over a fixed term at specified adjustable rates of interest, the right to retain the lien until the debt is paid off, the right to accelerate the loan upon default and to proceed against petitioners' residence by foreclosure and public sale, and the right to bring an action to recover any deficiency remaining after foreclosure.

508 U.S. at 329.

19

provision under the explicit exception to § 1322(b)(2) contained in § 1322(b)(5).[5]
*Id.* at 330.

Also, some debts may mature after the three-to-five-year target date for the completion of all payments under the plan.  The Code gives debtors a choice to either repay such long-term debt "inside" the plan—with the trustee acting as disbursing agent—or "outside" the plan, with payments coming directly from the debtor, often under the terms of the original debt instruments.

If the debtor elects to leave the rights of long-term lenders "unaffected" by the plan under § 1322(b)(2), then she continues to make the required payments outside the plan directly to the lender rather than through the bankruptcy trustee.  If the debtor chooses this path, the plan need not address (or even mention) the long-term debt and would not include the value of that debt in its calculation of plan payments.  Obligations handled like this are governed by the preexisting contractual terms, not by any provisions of the plan.  Thus, the debt retains its

---

[5]  11 U.S.C. § 1322(b)(5) states that a plan may:

> notwithstanding paragraph (2) of this subsection, provide for the curing of any default within a reasonable time and maintenance of payments while the case is pending on any . . . secured claim on which the last payment is due after the date on which the final payment under the plan is due.

11 U.S.C. § 1322(b)(5).

original maturity date and may not be extinguished until the debtor's obligations are fully met.[6]

Importantly, even a long-term debt incorporated into the plan under § 1322(b)(5) may not be discharged once the debtor finishes making payments under the plan. 11 U.S.C. § 1328(a)(1)[7]; *see* 8 Collier on Bankruptcy ¶ 1328.02, at 1328-14 (16th ed. 2016) ("It would be inequitable to provide for the payment of long-term debts in accordance with an installment payment schedule extending beyond the term of the plan, and still discharge those debts upon completion of payments under the plan."). So, once the plan terminates, the debtor must continue

---

[6] One reason a debtor might choose to make payments directly to a creditor rather than rolling payments into the bankruptcy process is to avoid trustee's fees, which are a percentage of the total amount owed by the debtor over the plan period. As discussed above, a home mortgage loan cannot be modified in bankruptcy, so there would be no benefit in dealing with the debt through the bankruptcy process. Thus, it is generally in the debtor's best interest to pay her mortgage outside the Chapter 13 plan rather than pull it into the plan and owe fees on payments she is obligated to make either way. Nothing in the Code requires such debts to be handled through the bankruptcy process.

[7] 11 U.S.C. § 1328(a)(1) states:

> (a) Subject to subsection (d), as soon as practicable after completion by the debtor of all payments under the plan, . . . the court shall grant the debtor a discharge of all debts provided for by the plan or disallowed under section 502 of this title, except any debt—(1) provided for under section 1322(b)(5).

11 U.S.C. § 1328(a)(1).

21

to maintain her long-term obligations even though her short-term obligations have been discharged.

In light of Debtor's successful efforts to structure her plan to permit direct payments to the Credit Union without any modification of the repayment terms, the most obvious conclusion regarding the Credit Union's mortgage is that it was left unaltered by Debtor's bankruptcy.  Because the plan did not propose any modification—likely because Debtor could not do so under § 1322(b)(2)—or stipulate to any terms about the Credit Union's mortgage, the mortgage must, by default, have remained governed by the original loan instruments, and thus was not "provided for" by the plan.

Debtor's contention is that, by mentioning that the Credit Union's mortgage will be paid directly, the mortgage was provided for by the plan and covered by the discharge—despite the fact that the plan never supplies any terms to govern the mortgage's repayment.  Debtor's paradoxical position is that by saying essentially nothing about the mortgage's repayment, the plan still somehow "provided for" the mortgage and discharged it.  In essence, Debtor's argument amounts to wanting

22

something for nothing, after Debtor expressly stated that she wanted nothing.

Here, that result is plainly not allowed by the Bankruptcy Code.[8]

### 3.    Other courts' treatment of this issue

Although no binding authority has directly addressed the issue of what it

means for a claim to be "provided for" by a plan under § 1328(a), a number of

courts that have broached this issue have reached the same conclusion we do.  In

*Mayflower Capital Company v. Huyck (In re Huyck)*, a mortgage that was in

default when the debtors filed for bankruptcy was at issue.  252 B.R. 509, 510–11

(Bankr. D. Colo. 2000).  The Chapter 13 plan effectively split the arrearages on the

mortgage and the future payments still due on the loan into two separate debts

under § 1322(b)(5).  *Id.* at 511.  The plan explicitly stated that the arrearages would

be cured through the plan (with disbursements to be made by the trustee), while

future payments on the loan would be made "outside the plan."  *Id.* at 510.  And,

similar to this case, the question presented was whether the future payments due on

---

[8]  This conclusion is reinforced by the fact that, if the plan's statement that Debtor would continue to make payments outside the plan "rather than through the Trustee" did somehow govern the Credit Union's mortgage, then presumably the payments would stay on the same terms as they were under the original loan documents because the plan provided no other repayment terms.  If that is the case, then Debtor likely was not entitled to discharge because she defaulted on her payments under the original loan terms.  *See* 11 U.S.C. § 1328(a) (stating that debts provided for by the plan shall be discharged "after completion by the debtor of all payments under the plan").

the loan paid outside the plan were nonetheless discharged along with the debts that were paid under the plan. *See id*. at 510–11. The court concluded that two consequences flowed from the debtors' decision to specify only that payments to the mortgage lender would be made outside the plan. First, the debtors, "outside of the Chapter 13 Plan, would be required to either pay the debt according to the original contract or work out some arrangement with [the lender] to pay the debt at some reduced amount or under different repayment terms." *Id*. at 514. That is, the original loan instruments governed repayment and were unaffected by the bankruptcy. The second "byproduct of the [debtors'] choice to make regular ongoing payments to [the lender] outside of the Plan was that the debt would not be discharged under" § 1328(a). *Id.*

The bankruptcy court in *In re Hunt*, No. 14-02212-5-DMW, 2015 WL 128048 (Bankr. E.D.N.C. Jan. 7, 2015), held the same. Based on analogous facts where the debtor's plan stated that the debtor would continue making mortgage payments directly to the lender, the court held that the mortgages were not entitled to be discharged. *Id.* at \*4. The court observed that allowing the mortgages to be discharged would "provide[ ] relief to a debtor with no corresponding benefit to the creditor and may actually cause potential harm to the creditor." *Id.* Further, "[g]ranting a discharge on long-term debts prior to the final payment being made is

24

not consistent with the underlying policies behind Chapter 13." *Id.* To hold otherwise would provide the debtor "the reward of the discharge" without requiring her to meet "all of the obligations of paying the debt over the original term of the loan." *Id.*

Although the case did not directly address the meaning of "provided for" under § 1328(a), the district court in *Bank of America, N.A. v. Dominguez (In re Dominguez)*, No. 1:12-CV-24074-RSR (S.D. Fla. Sept. 24, 2013) (Rosenbaum, J.) analyzed the meaning of "provided for" under § 1322(b)(5) and came to the same conclusion. In *Dominguez*, the plan specified that the debtor's mortgage would "be paid directly" rather than through the trustee. Slip op. at 7. The plan made no other mention of the mortgage, did not detail the monthly mortgage payment amounts, and did not set a schedule under which payments would be made. *Id*. Because the debtor made her mortgage payments "directly to Bank of America on a schedule governed by the original mortgage documents, not by the Plan," the court concluded that the mortgage was "not governed by the chapter 13 plan." *Id.* By explicitly stating that the mortgage payments would be paid outside the plan, the debtor:

> clarified to the Bankruptcy Court that she intended to keep current on her first mortgage payments, and she did not intend for those payments to be subject to the oversight of the Bankruptcy Court or otherwise governed by the Bankruptcy Code. The Plan's mere reference to the

25

> first mortgage as a claim that is *not* governed by the Plan does not, as Bank of America suggests, somehow accomplish the exact opposite of the language and make it a claim governed by the Plan for purposes of § 1322(b)(5).  In the same way that § 1322(b)(5) does not apply to a claim that is not referenced on the face of a chapter 13 plan at all, it does not govern a claim listed on a chapter 13 plan only for the purposes of identifying it as a claim not subject to the plan.

*Id.* at 12 (emphasis in original).  So, like here, the court concluded that the plan did not "provide for" the creditor's claim by merely mentioning that it would be paid outside the plan.  *Id.*

*Lawrence Tractor Company v. Gregory (In re Gregory)*, 705 F.2d 1118 (9th Cir. 1983), the only case aside from *Rake* relied upon by Debtor to support her expansive interpretation of "provided for," is distinguishable.  In that case, decided before *Rake*, the Ninth Circuit addressed a bankruptcy plan that "provide[d] for -0- payment to unsecured creditors requesting that said debts be discharged."  *Id.* at 1120.  In other words, the plan proposed to pay unsecured creditors nothing yet still discharge the debt.  *Id.* at 1122.  The court held that the plan "provided for" the unsecured creditor's debt and that it was accordingly discharged.  *Id.* at 1123.  In doing so, the court noted that "provided for" in § 1328(a) "simply requires that for a claim to become dischargeable the plan must 'make a provision for' it, *i.e.*, deal with it or refer to it."  *Id.* at 1122.

26

*Gregory*, however, set forth its expansive definition to address a situation much different than the one before us.  First, unlike this case where the plan failed to address the repayment terms for the Credit Union's mortgage, the plan in *Gregory* did stipulate to terms for the unsecured creditor's debt:  it proposed to pay nothing.  This put the unsecured creditor on notice that the plan would affect his rights.  *Id.* at 1122–23.  Here, because Debtor's plan did not address the treatment of the Credit Union's mortgage aside from stating that it would be paid directly, the Credit Union received no notice that its rights were being modified.  *See Fawcett v. United States (In re Fawcett)*, 758 F.2d 588, 591 (11th Cir. 1985) ("[I]t is the debtor's duty to put the creditor on notice by specifically detailing [the plan's treatment of a creditor's claim].  Failing this, the debtor as draftsman of the plan has to pay the price if there is any ambiguity about the meaning of the terms of the plan.").  Second, the unsecured creditor in *Gregory* argued only that there was no "practical difference" between the plan paying zero and the plan not acknowledging the debt at all.  *Id.*  Thus, the Ninth Circuit did not address a plan like the one we have here, which does not indicate how the debt should be treated.  Finally, the creditor in *Gregory* was unsecured and did not have the protection of the antimodification provision that the Credit Union does here.  *See infra* Section III.B.  In sum, *Gregory* addressed materially different facts and circumstances than

27

those before us today.  And based on the facts before us, we cannot conclude that the mere reference to a secured creditor's claim on a debtor's primary residence is sufficient to find that the claim was "provided for" by the plan and included in the discharge.

## B.    Whether Discharging the Credit Union's Mortgage Would Violate the Antimodification Provision in § 1322(b)(2)

Even if the plan were somehow construed as "provid[ing] for" the Credit Union's mortgage, there could still be no discharge of the mortgage given the antimodification provision in § 1322(b)(2).  The antimodification provision prohibits a plan from modifying "the rights of [a] holder[ ] of . . . a claim secured only by a security interest in real property that is the debtor's principal residence." Clearly, a discharge of a debtor's obligations under his residential mortgage would dramatically modify the rights of the holder of that mortgage.  Nonetheless, Debtor attempts to evade the clear prohibition of the antimodification provision based on two arguments.  First, Debtor contends that the Credit Union consented to the modification by having notice of it and failing to object.  Second, Debtor asserts that discharge is not a modification because it is a statutory injunction and only removes *in personam* liability.  Neither argument is persuasive.

As to the first argument—that the Credit Union consented to a modification that discharged the mortgage—although it is true that the Credit Union did not

28

object, the Credit Union failed to object because the plan did not contain any modification that would be objectionable. "It is the debtor's obligation . . . to specify as accurately as possible the amounts which it intends to pay the creditors." *Fawcett*, 758 F.2d at 590. So Debtor must "pay the price if there is any ambiguity" in her plan's terms. *Id.* at 591. Debtor's plan merely stated that payments on the Credit Union's mortgage would be made directly to the Credit Union "rather than through the Chapter 13 Trustee." Nothing about that representation indicated that the mortgage's repayment terms would be modified, that the 2022 maturity date would be shortened, or that the Credit Union would be paid less than the full value of its claims. Because there was nothing to object to, the Credit Union's silence does not imply that it consented to having its mortgage cut short and discharged in return for nothing.

Debtor's argument that discharge is not a modification is also unpersuasive. According to Debtor, upon discharge, the Credit Union could still foreclose on the property when and if the Debtor ceased making payments, but it could not seek a deficiency judgment against Debtor based on the difference between the loan balance and the value of the foreclosed property. Removal of the Credit Union's right to pursue *in personam* liability against Debtor, however, would necessarily modify the Credit Union's rights because it strips the Credit Union of a right

29

provided by the original loan instruments.  A creditor's rights "protected from modification by § 1322(b)(2)" are the rights under the original loan instruments as defined by state law.  *Nobelman*, 508 U.S. at 329–30.[9]  Under Florida law (the law governing the Credit Union's mortgage), the Credit Union has the right to seek a deficiency judgment against Debtor.  *See* Fla. Stat. § 702.06; *see also Royal Palm Corp. Ctr. Ass'n v. PNC Bank, NA*, 89 So. 3d 923, 929–33 (4th DCA 2012) (discussing a mortgagee's rights under Florida law to both foreclose on the property and obtain a deficiency judgment against the mortgagor).  By terminating the Credit Union's right to obtain an *in personam* judgment against the debtor, discharge undoubtedly modifies the Credit Union's rights and runs afoul of the antimodification provision.  *See Universal Am. Mortg. Co. v. Bateman (In re Bateman)*, 331 F.3d 821, 822 (11th Cir. 2003) (holding that a mortgagee's secured claim for arrearage "survives . . . to the extent it is not satisfied in full by payments under the plan, or otherwise satisfied under the terms [of] § 1325(a)(5), because to permit otherwise would deny the effect of 11 U.S.C. § 1322(b)(2)").

Finally, Debtor argues that because discharge is provided as a statutory remedy for completing a Chapter 13 plan, *see* 11 U.S.C. § 1328(a), a discharge is

---

[9]  Applying Texas law, the Supreme Court specifically noted that this included "the right to bring an action to recover any deficiency remaining after foreclosure."  *Nobelman*, 508 U.S. at 329.

30

not covered by the antimodification provision. Debtor, however, cites no authority that holds that, because discharge is provided for by statute, discharge of a creditor's claim can never be challenged as a modification of the creditor's rights. On its face, Debtor's contention is implausible. If a violation of the antimodification provision could be ignored based on nothing more than an argument that a debtor's right to a discharge of his debt should be deemed to be superior to the provision, it is hard to imagine when the antimodification provision would ever apply.

Indeed, in *Nobelman*, the Supreme Court refused "to give effect to [the] valuation and bifurcation of secured claims" provided to a Chapter 13 plan by § 506(a) because doing so "would require a modification of the rights of the holder of the security interest" prohibited by the antimodification provision. 508 U.S. at 332. *Nobelman* did recognize two instances in which the antimodification provision of § 1322(b)(2) does not apply. One is § 1322(b)(5)'s provision for curing arrearage, which is expressly exempted from the antimodification provision. *Id.* at 330; *see also* 11 U.S.C. § 1322(b)(5) (allowing a debtor to cure arrearages "notwithstanding paragraph (2) of this subsection"). The second is the automatic stay provision found in § 362, which the Court recognized as being "independent of the debtor's plan," *Nobelman*, 508 U.S. at 330, and which of course is merely a

31

temporary maintenance of the status quo that does not alter future rights or obligations.  Neither exception applies here.  A discharge under § 1328(a) is nowhere expressly exempted from the antimodification provision of § 1322(b)(2).  Further, unlike the automatic stay provision, a discharge, which applies only to those debts "provided for by the plan," is inextricable from the plan and wholly dependent on it.  In addition, the *Nobelman* exceptions to § 1322(b)(2) for "the automatic stay and cure [provisions] deal with past defaults, whereas the modifications permitted (or prohibited) by § 1322(b)(2) concern future obligations."  *Bank of Am., N.A. v. Garcia (In re Garcia)*, 276 B.R. 627, 635 (Bankr. D. Ariz. 2002).  By modifying the Credit Union's right to collect future obligations, a discharge of Debtor's mortgage obligations would violate the antimodification provision.

### C.  Whether the Credit Union's Failure to File a Proof of Claim Discharged the Mortgage

Regardless of whether the plan "provided for" the Credit Union's first mortgage, Debtor argues that the mortgage was discharged because the Credit Union failed to file a proof of claim for it.  *See* 11 U.S.C. § 502(b)(9) (disallowing claims that are not "timely filed" except in certain circumstances).  If no proof of claim is filed at the outset of bankruptcy, the creditor typically loses its right to repayment and the debt will be discharged under § 1328(a) as "disallowed."

Hence, Debtor contends that, due to the Credit Union's failure to file a proof of claim for the first mortgage, the Credit Union cannot pursue her *in personam* for any deficiency.

But, because Debtor raised this issue for the first time on appeal to the district court, she has waived it. "As a general rule," an issue raised for the first time on appeal will not be considered. *Blue Martini Kendall, LLC v. Miami Dade Cty.*, 816 F.3d 1343, 1349 (11th Cir. 2016). Debtor argues that this issue fits into an exception because the issue here is a "pure question of law," but that exception also requires that our refusal to consider the issue result in a miscarriage of justice. *See id.* (quoting *Dean Witter Reynolds, Inc. v. Fernandez*, 741 F.2d 355, 360–61 (11th Cir. 1984)). Debtor voluntarily entered into the first mortgage knowing that she would eventually have to repay it. She also had the opportunity to raise this issue in the bankruptcy court, but simply failed to do so. So not considering the issue here does not result in a miscarriage of justice.

Even if we were to consider this, the merits favor the Credit Union. In *Southtrust Bank of Alabama, N.A. v. Thomas (In re Thomas)*, we recognized that a secured creditor's lien survives even though the secured creditor failed to file a proof of claim. 883 F.2d 991, 997 (11th Cir. 1989). And we later acknowledged that, for secured creditors protected by the antimodification provision in

33

§ 1322(b)(2), *in personam* liability survives as well.  *See Bateman*, 331 F.3d at 834 & n.12.  Because the Credit Union's mortgage was nondischargeable under the antimodification provision, it passed through the bankruptcy unaffected even though no proof of claim was filed, and the Credit Union retained its right to pursue Debtor's liability *in personam*.

## CONCLUSION

A long-term debt with a post-plan maturity date is not "provided for" by a Chapter 13 plan under § 1328(a) if the plan only states that the debt will be paid outside the plan without setting terms for the debt's repayment.  So, because the Credit Union's mortgage was not "provided for" by the plan under § 1328(a), it was not discharged.  Even if the mortgage was "provided for," it still would not be discharged because discharge would violate § 1322(b)(2)'s antimodification provision.  Finally, the issue of whether the Credit Union's failure to file a proof of claim discharged its mortgage was raised for the first time on appeal and thereby waived.  Yet, even if we considered Debtor's argument, the Credit Union's failure to file a proof of claim did not discharge the mortgage.

Accordingly, we **AFFIRM**.

34

JILL PRYOR, Circuit Judge, concurring in part and concurring in the judgment:

I concur in the judgment affirming the district court. I also join in Parts III.B and III.C. of the majority opinion. I do not join in Part III.A, however.

The majority opinion sets forth two alternative reasons for concluding that the bankruptcy court's discharge order did not discharge debtor Mildred Dukes's mortgage debt owed to creditor Suncoast Credit Union. In Part III.A. the majority explains that the debt was not "provided for by the plan" and thus not discharged. 11 U.S.C. § 1328. And in Part III.B., the majority concludes that the Bankruptcy Code's antimodification provision barred the bankruptcy court from discharging or otherwise modifying Dukes's mortgage debt to Suncoast, which was secured by her principal residence. *See id.* § 1322(b)(2). I would affirm on the basis of the antimodification provision in § 1322(b)(2) alone, without reaching the "provided for" issue. For that reason, I do not join Part III.A. of the majority opinion.